511 F.2d 724
 NATIONAL CAR RENTAL SYSTEM, INC., Plaintiff-Appellee-Cross-Appellant,
v.
BETTER MONKEY GRIP COMPANY and Wilco Truck Rental, Inc.,
Defendants-Appellants-Cross-Appellees.
 No. 74--1473.
 United States Court of Appeals,
Fifth Circuit.
 April 21, 1975.
Rehearing Denied June 25, 1975.
 
 Herbert S. Bonney, Jr., Robert A. Stripling, Jr., Dallas, Tex., for Better Monkey Grip.
 Stephen E. Blythe, Dallas, Tex., Frank Ingraham, Nashville, Tenn., for Wilco Truck.
 Ralph W. Currie, Dallas, Tex., for plaintiff-appellee.
 Appeals from the United States District Court for the Northern District of Texas.
 Before BELL, AINSWORTH and RONEY, Circuit Judges.
 BONEY, Circuit Judge:
 
 
 1
 This is a Texas diversity suit on a written contract. Trial was to a jury on special interrogatories covering various theories advanced by the parties. After the jury answered the special interrogatories, defendants filed a motion for judgment based on these verdicts, while plaintiff filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. The district court reviewed the evidence presented at trial, re-examined the pleadings, briefs and related documents which had been submitted and declared the answers of the jury 'to be against the weight and preponderance of the evidence and, therefore, null and void, except where specifically adopted.' The court granted a judgment n.o.v. in favor of plaintiff without applying the correct legal standard set forth in Boeing Co. v. Shipman, 411 F.2d 365 (5th Cir. 1969) (en banc). By this action the defendants were deprived of their right to a jury trial, although the standard utilized by the court would have been appropriate for the granting of a new trial. United States v. 1160.90 Acres of Land, 432 F.2d 910, 915 (5th Cir. 1970); United States ex rel. Weyerhaeuser Co. v. Bucon Construction Co., 430 F.2d 420, 423 (5th Cir. 1970); Wright & Miller, Federal Practice and procedure: Civil § 2806 (1973). Consequently, we reverse and remand for a new trial.
 
 
 2
 The case involved the termination of a contract for the lease of trucks and trailers and the consequent obligation to purchase the equipment by the lessee. The controversy centered around the obligation of each party upon termination of the contract. The plaintiff lessor sued for the contract price of the vehicles. The defendants defended on the ground that the contract seller had failed to provide purchase price information and titles within the proper time, voiding the obligation of the lessee to purchase. A somewhat detailed history of the facts and proceedings is necessary to an understanding of the issues in the case.
 
 
 3
 In 1962, Baker-Thompson Company purchased Better Monkey Grip Company's fleet of trucks and trailers and leased the equipment back to Monkey Grip. Sometime prior to 1971, plaintiff, National Car Rental System, Inc., acquired the Baker-Thompson Company, thereby succeeding to its rights and obligations under the contract.
 
 
 4
 The vehicles under lease were described in schedules attached to the written contract. When one vehicle was replaced by another, a new schedule describing the replacement was executed and substituted for the schedule describing the vehicle being withdrawn, without reexecution of the entire contract. In addition to describing the vehicle, each schedule showed the delivery date of the vehicle, the expiration date for the vehicle's use under the contract, the agreed value of the vehicle, and the agreed rate of depreciation.
 
 
 5
 Paragraph 11 of the contract gave the lessee, Monkey Grip, the right to terminate the lease as to any particular vehicle, after the vehicle had been in Monkey Grip's service for one year, by giving sixty days written notice.[1] It also provided, however, that if the termination was to become effective prior to the expiration date applicable to a particular vehicle, Monkey Grip was obligated to purchase the equipment by paying, in cash, a sum equal to the difference between the agreed value and the agreed accrued depreciation. Monkey Grip also agreed to pay, upon cancellation of the lease, all unamortized license tag costs, Federal Highway Use Taxes, and the painting and lettering costs attributable to the vehicles. Title to the vehicles was to remain in the owner-lessor until the entire purchase price was paid by the lessee, Monkey Grip.
 
 
 6
 In the spring of 1971, Monkey Grip and Wilco Truck Rental, Inc. entered into negotiations which eventually culminated in a truck lease and service agreement which would eliminate the need for the contract with National. The agreement was signed on May 17, 1971.
 
 
 7
 By an oral agreement with Monkey Grip, Wilco obligated itself to purchase the equipment which Monkey Grip had been leasing from National and which Monkey Grip was obliged to purchase under its contract with National. Wilco intended, to the extent that the new vehicles described in its lease with Monkey Grip had not arrived at the time the National lease terminated, to permit Monkey Grip continued use of the old National fleet of vehicles. By this same agreement, Wilco agreed to indemnify Monkey Grip for any expenses incurred in canceling the National contract.
 
 
 8
 Shortly thereafter, National's Dallas office received from Monkey Grip a letter dated May 19, 1971, which gave notice 'to cancel all vehicle covered by the Vehicle Lease Agreement' between National and Monkey Grip. The notice also stated:
 
 
 9
 Said Vehicle Lease Agreement has a 60 day cancellation notice, however, we will be willing to take over this equipment immediately or no later than July 17, 1971.
 
 
 10
 We would like the purchase price on our equipment and copies of all executed Schedule A's immediately. Wilco Truck Rental, Inc. will give you a Certified Check for the equipment upon receipt of said equipment and titles.
 
 
 11
 We will require separate invoices for each piece of equipment showing the depreciated value of the equipment plus the depreciated amount of taxes and licenses with a total for each.
 
 
 12
 During the next few weeks, various officials of both Monkey Grip and Wilco contacted National officials in its Dallas office by telephone in an effort to expedite the buy-out so that there could be uninterrupted use of the vehicles. They also sought, as originally requested in the May 19 letter to National, purchase price information and copies of all vehicle schedules currently in effect. Although these documents were an integral part of the contract between National and Monkey Grip and had to be signed by Monkey Grip to be effective, Monkey Grip apparently did not have in its possession accurate, completed copies of all outstanding schedules which it needed to verify and compute the purchase price of the equipment. In response to these telephone calls, National stated that it elected to run the equipment out the sixth day period, that company policy required it to supply buy-out information only to its lessee, and that the purchase price information was not ready for Monkey Grip.
 
 
 13
 The sixty day notice period expired on July 18, 1971.[2] On July 18, neither Monkey Grip nor Wilco had received any of the material which had been requested from National. Nor had National made any effort to make the titles to the vehicles available to either party. As a matter of fact, the Dallas branch of National did not even request that the titles to the equipment be transmitted to it from the home office in Minneapolis until July 21, three days after the end of the cancellation period. With the exception of one unit which was subject to a mortgage which had to be paid off, the titles to all vehicles were transmitted by certified mail and were received in Dallas on August 4, 1971. The title subject to the mortgage was finally received in October 1971.
 
 
 14
 During the workweek which began on Monday, July 12, 1971, Monkey Grip returned all of the leased vehicles to the National maintenance lot, except one which was dispatched on a trip to California and which was returned on July 22. Thereafter, Monkey Grip never again used the National vehicles.
 
 
 15
 By correspondence dated August 2, 1971, and hand delivered on August 5, 1971, National delivered to Monkey Grip an itemized statement of the purchase price for each vehicle, a schedule of unamortized ancillary costs as provided for by the contract, and a final bill for equipment covered by the lease agreement. Monkey Grip claims that some of the purchase price information was incorrectly calculated and that some of the unamortized costs were improperly included in the accounting. It further argues that it was unable to check the figures since National had never furnished the completed vehicle schedules requested.
 
 
 16
 By letter dated August 9, 1971, Monkey Grip advised National that it would not purchase the fleet of vehicles pursuant to paragraph 11 of the contract because the purchase price information was not timely furnished as requested and because neither titles to the equipment nor the equipment itself had been delivered. The letter provided:
 
 
 17
 Due to the fact that we were not provided with the necessary information at the prescribed time, we were forced to rent outside equipment in order to perform our necessary transportation needs and were required to pay a premium price (along with other problems incurred). This was due to your company's failure to furnish our company with the required information (and the equipment) to enable us to deliver the equipment to our present contractor and use the equipment under lease agreement with said contractor after the expiration date of July 17, 1971. It was not until August 5, 1971 that the required information was presented. A period of nineteen (19) days elapsed between July 17, 1971 and August 5, 1971, at which time we were presented a portion of the required information and paper work needed in accordance with the letter of cancellation. Therefore, we are returning the equipment billing and miscellaneous billing to your company as, in accordance with our interpretation of our contract, we feel no obligation to purchase the equipment, due to the delay and failure of National Car Rental in complying with the lease agreement as required. (Emphasis added).
 
 
 18
 Once Monkey Grip finally returned the leased vehicles to National, Wilco had the obligation of furnishing transportation equipment to Monkey Grip. It procured other vehicles for temporary use by Monkey Grip until the new fleet of trucks and trailers contemplated under the Wilco-Monkey Grip contract were delivered and put in service.
 
 
 19
 National by letter dated September 28, 1971, made demand on Monkey Grip to honor its contractual obligations. Monkey Grip again refused, asserting that National's failure to deliver titles to the equipment by July 17, 1971, relieved Monkey Grip of its obligation to purchase the equipment. Finally, on October 12, 1971, National notified Monkey Grip that an 'event of default,' as defined in the contract, had occurred and that National was asserting its right to terminate the contract. This suit was brought shortly thereafter.
 
 
 20
 The defendants have proceeded throughout the course of this litigation on the theory that since National did not furnish the information requested in the May 19 letter in the prescribed time, Monkey Grip had no obligation to purchase the equipment leased from National. The jury was asked to answer a series of special interrogatories addressed to this theory.[3] It found that (1) sixty days was a reasonable time for National to furnish Monkey Grip the buy-out information, (2) National's furnishing information on August 5 was unreasonable, and (3) it was the intention of the parties that this information would be furnished within sixty days of the cancellation notice. The trial judge found these jury findings to be against the weight and preponderance of the evidence but went on to hold that Auguat 5 was, under the circumstances, a reasonable date to furnish the itemized buy-out information.
 
 
 21
 There is no provision in the contract between Monkey Grip and National, specifically none in paragraph 11, supra note 1, which imposes upon National any obligation to furnish the information requested by Monkey Grip. The contract provides only that Monkey Grip must, under the circumstances of this case, purchase and pay for the equipment until which time the title to the equipment is to remain in National. The express terms of the contract only require National to supply Monkey Grip the equipment and titles after the purchase price had been paid.
 
 
 22
 The defendants argue that National, nevertheless, had an implied obligation to furnish the requested information within the sixty day period. Due to the delivery procedures employed, Monkey Grip often did not receive completed copies of the vehicle schedules after new vehicles were put in service. The completed schedules contained certain information which was not on the copies signed and retained by Monkey Grip in ordering the equipment. The defendants emphasize that the completed schedules were needed in order to compute the buy-out figures. They also claim they had no way of computing the unamortized expenses to be repaid under paragraph 11 of the contract without certain additional information from National. Under these circumstances, the defendants argue, National breached its implied duty of cooperation, which requires that a party to a contract do that which is necessary for the other party's performance. By its action it prevented Monkey Grip from performing its obligation to purchase the equipment. See L. H. Land Painting Co. v. S. & P Construction, Inc., 516 S.W.2d 14, 16 (Tex.Civ.App.1974); Atomic Fuel Extraction Corp. v. Slick's Estate, 386 S.W.2d 180, 186 (Tex.Civ.App.1964), writ ref. n.r.e., 403 S.W.2d 784 (Tex.Sup.Ct.1965); 5 Williston on Contracts (3rd ed. 1961) SS 670, 677, 677A. National counters that although Monkey Grip requested the schedules, it never notified National that it did not possess completed copies of the documents which were needed in order to calculate the contract purchase price.
 
 
 23
 At the trial there was substantial evidence by several witnesses as to 'usage and custom' and testimony by the official of Baker-Thompson Company who negotiated the lease with Monkey Grip as to the discussion of the parties at that time. Texas law governs the admissibility of such evidence because the issue is one of state substantive law governing construction of contracts. Harville Rose Service v. Kellogg Co., 448 F.2d 1346, 1349 (5th Cir. 1971), cert. denied, 405 U.S. 987, 92 S.Ct. 1248, 31 L.Ed.2d 453 (1972); Moore, 1A Federal Practice 0.313 (2d ed. 1974). Contrary to National's argument, this extrinsic evidence was properly admissible as an aid in interpreting the intention of the parties, the contract itself being ambiguous and uncertain on the termination and purchase procedures. See Home Indemnity Co. v. Draper, 504 S.W.2d 570, 578 (Tex.Civ.App.1974); Best Building Co. v. Sikes, 394 S.W.2d 57, 63 (Tex.Civ.App.1965). The evidence was aimed at proving, and may well have been sufficient to support a jury verdict, that the parties to the contract intended for the buy-out to be completed within the sixty day cancellation period. But what happens if these intentions are thwarted by particular facts and circumstances?
 
 
 24
 There was little, if any, evidence presented as to the intention of the parties with respect to just how the buy-out was to be effectuated, where the depreciation schedules were not properly attached to the contract so that Monkey Grip could compute the amount that was intended to be paid within the sixty day period. There was little evidence, and no instruction, as to National's duty, if any, to compute the purchase price information and supply the figures to Monkey Grip. In spite of this lack of evidence, the jury found in Special Issue No. 6A, for example, that the parties did intend for information relative to repurchase of the trucks to be furnished within sixty days after written notice of cancellation. In setting aside the jury's finding on this and peripheral facts as against the weight of the evidence, the court engaged in a discretionary exercise of the judicial function reviewable on the abuse of discretion standard. United States v. 1160.96 Acres of Land, 432 F.2d 910, 915 (5th Cir. 1970). The appeal does not reveal reversible error under such standard.
 
 
 25
 Once the jury's findings were set aside, the court faced the problem of what to do with the case. It was at this point that the court substituted its own determination that the evidence proved that National had acted reasonably and entered the province of the jury. The evidence being in conflict on the issue, this was error.
 
 
 26
 The extent of National's obligation to supply Monkey Grip with requested information as a result of Monkey Grip's lack of means of computing the buy-out figures and its repeated requests for the information, was never addressed directly by the court, either before submitting the case to the jury or after the jury's return of the special interrogatories. The court below erred in not addressing the issue as to the nature of National's legal responsibility to supply purchase price information and the vehicle schedules, if any, and the elements that would control the issue of timeliness from a factual or legal standpoint, if it had such a responsibility. Only after the court determines as a matter of law that National had obligation to furnish the requested information, or the jury makes the decision as an issue of fact on proper instructions, is it necessary to consider whether the information was timely furnished. If the information was not timely provided, then the court would need to determine the legal effect of such action.
 
 
 27
 Our decision to remand is premised on the basis of the district court's finding that the jury's answers to the special interrogatories were against the weight and preponderance of the evidence. Such a determination, although not adequate for granting a judgment n.o.v. as was done, Boeing Co. v. Shipman, 411 F.2d 365 (5th Cir. 1969) (en banc), can be proper for granting a new trial. Under the Boeing standard, a trial judge may grant an instructed verdict or a judgment n.o.v. only where as a matter of law the evidence is insufficient to sustain the claim, issue or defense. But even if the judge finds that the evidence passes muster under that standard, the judge still has wide discretion in granting a new trial. Simmons v. King,478 F.2d 857, 867 (5th Cir. 1973); United States v. 1160.96 Acres of Land,432 F.2d 910, 914 (5th Cir. 1970). As Judge Orie L. Phillips, writing for this Court, said in United States ex rel. Weyerhaeuser Co. v. Bucon Construction Co., 430 F.2d 420, 423 (5th Cir. 1970):
 
 
 28
 There is an important distinction between a motion for a directed verdict or a motion for a judgment n.o.v. on the one hand and a motion for a new trial on the other. In passing on a motion for a directed verdict, or for a judgment n.o.v., the court does not exercise discretion, but decides a pure question of law, that is, whether the evidence, considered in the light most favorable to the party against whom the motion is directed, affords substantial support for a verdict in his favor.
 
 
 29
 If a motion for a directed verdict or for a judgment n.o.v. is sustained, judgment is entered for the movant and the case is ended in the trial court, but the sustaining of a motion for a new trial does not result in a final judgment; it only grants another trial by a different jury.
 
 
 30
 In passing on a motion for a new trial, the court may and should exercise a sound discretion, and its ruling thereon will not be reviewed in an appellate court in the absence of a clear abuse of discretion.
 
 
 31
 A trial judge, on a motion for a new trial, may set aside a verdict and grant a new trial, if in his opinion 'the verdict is against the clear weight of the evidence . . . or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict.'
 
 
 32
 The exercise of that power is not in derogation of the right of trial by jury, but it is one of the historic safeguards of that right.
 
 
 33
 The distinction above stated between a motion for a directed verdict or for judgment n.o.v. on the one hand and a motion for a new trial on the other was firmly embedded in the common law and has long been recognized by the decisions of this court and other national courts. (Footnotes omitted).
 
 
 34
 The above quoted law readily answers the defendants' argument that we should reinstate the jury verdict and direct judgment in defendants' favor because the findings are supported under the Boeing Co. v. Shipman standard. We can reverse the court on the judgment n.o.v. which requires a decision of law that the findings are not supported, but a study of the jury's answers, a thorough review of the record, a careful analysis of the written and oral argument reveals that the district court did not abuse its discretion in deciding that the jury's responses are against the weight of the evidence.
 
 
 35
 At least partially accounting for the jury's answers may have been the manner in which the questions were drafted, and the failure of counsel to define sharply the factual issues. For instance, in Special Issue No. 1 the jury was asked:
 
 
 36
 What do you find from a preponderance of the evidence to be the total depreciated price of the trucks involved herein as of October 21, 1971?
 
 
 37
 Answer in dollars, if any, and cents, if any, or none.
 
 ANSWER None
 
 38
 Since the jury was asked to supply a figure, the amount of which was fixed by the contract and which was capable of being determined by simple mathematical computation, giving it the option of answering 'none' was confusing. The answer given illustrates the jury's lack of comprehension as to some of the issues it was to decide.
 
 
 39
 We remand the case for a new trial. In view of this disposition of the case, it is unnecessary to reach the other issues raised by the parties.
 
 
 40
 Reversed and remanded.
 
 
 
 [1]
 11. (a) After one year from the delivery date, LESSEE may elect to cancel this agreement as to any particular scheduled vehicle by giving to OWNER 60 days written notice of such election; provided, however, that if prior to expiration date, LESSEE must purchase and pay for such vehicle in cash the scheduled agreed value therefor, less a sum for depreciation calculated at the rate shown (depreciated price). The depreciated price shall not be less than 15% of said agreed value. Vehicle title shall remain in OWNER until the entire purchase price is paid. LESSEE also agrees to pay, upon such cancellation, all unamortized license tag costs, Federal Highway Use Tax, and OWNER'S painting and lettering costs
 
 
 [2]
 In its cancellation letter, Monkey Grip had computed this period as ending on July 17. This error resulted because the letter to National was sent a day later than originally anticipated
 
 
 [3]
 SPECIAL ISSUE NO. 5
 Do you find from a preponderance of the evidence that August 5, 1971, was a reasonable time for National Car Rental to furnish Monkey Grip the buy out information as outlined in paragraph 11(a) of the contract?
 Answer 'yes' or 'no'. ANSWER No
 If you have answered Special Issue No. 5 'no', then answer Special Issue No. 6.
 SPECIAL ISSUE NO. 6
 On what date do you find from a preponderance of the evidence it would have been reasonable for National Car to have furnished the information requested in Plaintiff's Exhibit 1, paragraph 11(a)?
 Answer by giving the day, if any. ANSWER 60 days (7--17--71)
 SPECIAL ISSUE NO. 6A
 Do you find from a preponderance of the evidence that it was the intention of the parties that under the provisions of paragraph 11(a) of the contract in question information relative to repurchase of the trucks would be furnished within 60 days after written notice of cancellation?
 Answer 'It was not' or 'It was'. ANSWER It was