**J & H AUTO TRIM CO., INC.,**
Plaintiff-Appellant,

v.

**BELLEFONTE INSURANCE CO., et al.,**
Defendant-Appellee.

No. 80–5750.

United States Court of Appeals,
Eleventh Circuit.

June 10, 1982.

D. Russell Stahl, Gordon & Maney, David A. Maney, Tampa, Fla., for plaintiff-appellant.

Fowler, White, Gillen, Boggs, Villareal & Banker, P.A., William A. Gillen, W. Donald Cox, Tampa, Fla., for defendant-appellee.

Before GODBOLD, Chief Judge, HILL and FAY, Circuit Judges.

FAY, Circuit Judge:

In this diversity suit, plaintiff J & H Auto Trim Company, Inc., has been to trial twice seeking recovery from the defendant insurance companies of $280,800; the aggregate amount of coverage provided by five policies issued by the defendants. Both juries rendered verdicts in favor of the plaintiff. A new trial was granted after the first verdict. After the second verdict, the District Court granted a judgment notwithstanding the verdict and, in the alternative, a new trial. We are convinced from our review of the record that the verdict rendered by the second jury is supported by substantial evidence and is not contrary to the great weight of the evidence.[1] The order of the District Court is reversed and the jury verdict ordered reinstated.

1. The plaintiff does not appeal from the order granting a new trial after the first verdict.

This saga began when John Jackson and James Harris purchased a quantity of vinyl car tops, roof moldings, and other items in November, 1975, from Pop's Vinyl Tops, Inc., for $10,000. At the time, Pop's Vinyl Tops was encountering financial difficulty and an influx of cash was needed. All parties to the transaction recognized that a bargain sale had been made. Pop's Vinyl Tops sold approximately 25% of its inventory to Jackson and Harris, retaining mostly current model tops and selling mostly "obsolete" tops—a term used in the trade to refer to tops for other than current year automobiles. The obsolete tops were for automobile models from 1968 through 1974.

In mid-December, 1975, Jackson and Harris obtained $180,000 in insurance on the vinyl tops under three policies.[2] In late January and early February, 1976, Jackson and Harris formed the plaintiff corporation and the vinyl goods were transferred to the corporation in exchange for the corporate stock. The bill of sale representing this transaction stated that $959,125 worth of goods (13,250 vinyl tops valued at $239,125 and 15,000 sets of vinyl roof moldings valued at $720,000) were transferred to the plaintiff. On February 4, 1976, the tops were insured for an additional $100,800 pursuant to two insurance policies.[3] On the night of February 9, 1976, the building in which the vinyl goods were stored was partially destroyed by fire. The following night, a second fire destroyed the building and its contents. Strong evidence indicated that both fires were deliberately set. After the fires, the plaintiff submitted a sworn proof of loss to the defendant insurance companies which claimed that the actual cash value of the insured property was $345,925.

The case was initially tried in January, 1980, and the jury found for the plaintiff, determining the actual cash value of the insured merchandise to be $345,925. After entry of an order granting the defendants' motion for a new trial, the case was tried again upon the same issues in July, 1980. The second jury was asked to respond to four interrogatories:

1. Have the defendants proved that in applying for the insurance policies in this case the plaintiff made any misrepresentations or concealed any fact which was either fraudulent or material to the acceptance of the risk by defendants or was such that in good faith the defendants would not have issued the respective policies in the amounts they did if the true facts had been known to them? (Answer Yes or No)

. . . .

2. Have the defendants proved that the plaintiff intentionally burned, caused or procured the burning of the insured property? (Answer Yes or No)

. . . .

3. Have the defendants proved that plaintiff wilfully misrepresented the value of the insured personal property damaged or destroyed in completing the proofs of loss or inventory submitted as a part thereof, or when plaintiff's representatives were examined under oath after the loss? (Answer Yes or No)

. . . .

4. What was the "actual cash value" of the insured personal property damaged or destroyed by the fires involved in this case as of the date of such fires?[4]

---

2. Bellefonte Insurance Company provided insurance of $60,000; California Union Insurance Company provided insurance of $90,000; and Underwriters at Lloyd's, London, provided insurance of $30,000.

3. The policies were written by Canadian Universal Insurance Company and Sphere Insurance Company; each policy provided coverage of $50,400. Although the two policies described the insured property as "vinyl tops," Harris

and Jackson testified that they informed their insurance broker that the additional coverage was to insure 2,600 sets of the roof moldings. The case was submitted to the jury on the theory that the policies covered only the vinyl tops. On appeal, the plaintiff does not contest that the coverage itself was limited to the vinyl tops.

4. Substantially the same interrogatories were propounded to the first jury.

The jury answered "no" to the first three questions and calculated the actual cash value to be $165,000.

In response to the defendants' post-trial motion, the District Court granted a judgment n. o. v. as to questions 1, 3, and 4; and, should that ruling be reversed, the court granted a new trial as to all four questions. *See* 501 F.Supp. 942 (M.D.Fla. 1980).

## I. The Order Granting A Judgment Notwithstanding the Verdict

■■■ A motion for a judgment n. o. v. or directed verdict tests the sufficiency of the evidence to support a jury verdict. *Boeing Co. v. Shipman*, 411 F.2d 365, 373–74 (5th Cir. 1969) (*en banc*). Since the sufficiency of the evidence to support a verdict is a question of law, the standard of review on appeal is the same as that applied by the trial court in making its initial ruling. *Williams v. United Insurance Co. of America*, 634 F.2d 813, 815 (5th Cir. 1981); *United States v. Bucon Construction Co.*, 430 F.2d 420, 423 (5th Cir. 1970). *Boeing Co. v. Shipman* sets forth the criteria for evaluating such motions.

> [T]he Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. . . . [I]f there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. . . . *There must be a conflict in substantial evidence to create a jury question.* However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

411 F.2d at 374–75 (footnote omitted) (emphasis added).

*The Actual Cash Value—Interrogatory 4*

In granting a judgment n. o. v. as to questions 1, 3, and 4, the trial judge recognized that the actual cash value [5] of the insured property was material to determining the amount of recovery and whether, because of concealments or misrepresentations regarding the actual value, the plaintiff should be denied recovery. Tackling that issue first, the trial judge ruled that testimony given by Jackson as to the value of the vinyl tops should not have been admitted into evidence and was not properly before the jury. Excluding that evidence, the District Court found that the only substantial evidence of the actual cash value was the price Jackson and Harris paid for the vinyl goods in November, 1975; that is, $10,000. The judgment n. o. v. as to question 4 limited recovery to that amount.

We begin by examining the basis of the trial court's exclusion of Jackson's testimony. Jackson testified that in December, 1975, he made four block sales to independent auto installers; that these sales were for lots of 20 to 50 tops; and that unpadded tops were sold for $18.00–$18.50 each, while padded tops were sold for $60.00–$75.00 each. Jackson also testified that the plaintiff corporation sold 500 tops to Jackson's wholly-owned business, Sporty Top Shop, Inc., for $13,000 ($30.00–$35.00 each for 300 padded tops and $18.50 each for 200 unpadded tops).

■■ The trial court's ruling excluding Jackson's testimony is based on two grounds. First, that the only admissible evidence going to actual cash value was what the tops would have sold for in a bulk sale at the time of the loss or, failing that proof, their wholesale cost, *i.e.*, the $10,000

**5.** "Actual cash value" is a standard phrase included in insurance policies to describe the extent of coverage provided by the policy. The policies in this case provided that the plaintiff was insured in an amount not exceeding the policy limits "to the extent of the actual cash value of the property at the time of the loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time after such loss . . . ."

purchase price. Second, that Jackson's testimony was self-serving and unsupported by other evidence. As to the latter, an owner of property is competent to testify regarding its value. "The weight of such testimony is, of course, affected by the owner's knowledge of circumstances which affect value, and as an interested witness, it is for the jury to evaluate the credibility of his testimony." *Berkshire Mutual Insurance Co. v. Moffett*, 378 F.2d 1007, 1011 (5th Cir. 1967) (footnotes omitted); *see also Dietz v. Consolidated Oil & Gas, Inc.*, 643 F.2d 1088, 1094 (5th Cir.), *cert. denied*, 454 U.S. 968, 102 S.Ct. 513, 70 L.Ed.2d 385 (1981).

■■ As to the first ground, the District Court's ruling is unduly restrictive. Florida courts have adopted the broad evidence rule for determining the actual cash value of destroyed property.[6] *New York Cent. Mut. Fire Ins. Co. v. Diaks*, 69 So.2d 786, 788–89 (Fla.1954); *Worcester Mutual Fire Insurance Co. v. Eisenberg*, 147 So.2d 575, 576 (Fla.App.1962); *see also Moffett*, 378 F.2d at 1010–12 (applying the rule). "Under this rule, any evidence logically tending to establish a correct estimate of the value of the damaged or destroyed property may be considered by the trier of facts to determine 'actual cash value' at the time of loss." *Eisenberg*, 147 So.2d at 576.

In *Diaks*, the Florida Supreme Court explained that " 'actual cash value' means the *actual value expressed in terms of money of the* thing for the purpose for which it was used . . . . ' " 69 So.2d at 789 (quoting *McIntosh v. Hartford Fire Insurance Co.*, 106 Mont. 434, 78 P.2d 82, 84 (1938)) (emphasis in Florida opinion). The *Diaks* court indicated that, although not synonymous with actual cash value, replacement cost could be considered as one of the factors in determining actual cash value. 69 So.2d at 788–89. In *Eisenberg*, wholesale cost was

listed as another factor which could properly be considered. 147 So.2d at 576. Finally, in *Moffett*, the defendants contended that, under Florida law, the only allowable criteria for evaluating the value of property lost by fire were market value and replacement value. The Fifth Circuit, however, held that the plaintiff's estimates of the value of his propɛrty were admissible under the flexible test of the broad evidence rule. 378 F.2d at 1011.

The District Court in this case acknowledged the applicability of the broad evidence rule, yet held Jackson's testimony to be inadmissible under that liberal rule. The District Court characterized Jackson's testimony as evidence of retail value. *See, e.g., Skaggs Drug Centers, Inc. v. City of Idaho Falls*, 90 Idaho 1, 407 P.2d 695 (1965); *Millison v. Ades of Lexington, Inc.*, 262 Md. 319, 277 A.2d 579 (1971); *Irv-Bob Formal Wear, Inc. v. Public Service Mutual Insurance Co.*, 81 Misc.2d 422, 366 N.Y.S.2d 596 (Civ.Ct. 1975), *aff'd*, 86 Misc.2d 1006, 383 N.Y.S.2d 832 (Sup.Ct.App.Term 1976); *Mock v. Terry*, 251 Or. 511, 446 P.2d 514 (1968); *Shield Co. v. Cartwright*, 172 S.W.2d 108 (Tex.Civ. App.1943), *aff'd*, 142 Tex. 324, 177 S.W.2d 954 (1944). Under those cases, when stock in trade is destroyed, retail value is an inappropriate measure of fair market value because the retail sales price includes a mark-up for overhead and profit. In lieu of evidence of retail price, those cases hold that only evidence as to the replacement value or wholesale value is admissible to prove market value.

■ Under Florida's broad evidence rule, however, replacement value and wholesale value are factors, not shackles, by which to determine actual cash value. *See Moffett*, 378 F.2d at 1011.[7] The rule permits "any evidence which logically tends to establish a reasonable approximation of the value of

**6.** This issue is one of state substantive law concerning the construction of the insurance policies, *see* note 5 *supra*. *National Car Rental System, Inc. v. Better Monkey Grip Co.*, 511 F.2d 724, 729 (5th Cir.), *cert. denied*, 423 U.S. 894, 986, 96 S.Ct. 193, 394, 46 L.Ed.2d 126, 303 (1975). In this case Florida law governs the admissibility of such evidence.

**7.** We note that the plaintiff proffered the testimony of Ralph Lloyd, president of Pop's Vinyl Tops, regarding the replacement cost of the tops. This testimony was ruled inadmissible by the District Court.

the property destroyed." *Id.* What tends to establish a reasonable approximation of value will depend upon the property involved and the circumstances of the case. Here, it is undisputed that the tops were secured at a bargain price. To ascertain the true value of that purchase Jackson's testimony regarding lot sales of the tops to businesses engaged in installing the tops was relevant, admissible, and properly before the jury.

Considering Jackson's testimony along with the other evidence presented to the jury leads to the inescapable conclusion that the judgment n. o. v. limiting the actual cash value of the insured property to $10,000 must be reversed. Jackson's testimony was in sharp conflict with the defendants' contention that the insured property was worth no more than $10,000. Other evidence presented at trial also tended to indicate that the value of the property was something more than $10,000. The jury was informed that on April 30, 1975, Pop's Top Shop, Inc. sold all of its assets to Pop's Vinyl Tops, Inc. Listed on the sale closing statement were 8,478 vinyl tops which were valued at $25,434 ($3.00 each). The purchase order signifying the sale by Pop's Vinyl Tops to Jackson and Harris indicated that approximately 12,000 tops were included in that transaction. Ralph Lloyd, president of Pop's Vinyl Tops, testified that he sold 25% of the inventory of his new business to Jackson and Harris because "we needed cash flow desperately, and it was a good deal for both of us." Record, vol. 10, at 185. Although the purchase order described the vinyl tops as obsolete, Lloyd testified that, while current model tops sold more quickly than older tops, there was a demand for the older tops as replacement tops and they sold at a higher price than tops for new cars. Lloyd also testified that after the Jackson/Harris transaction most of his remaining inventory of tops had been sold by the time of the second trial. He indicated that he perhaps still retained some of the obsolete tops in inventory. Finally, the bill of sale representing the transfer of the tops and roof moldings from Jackson and Harris to the plaintiff corpora-

tion stated that 13,250 tops were valued at $239,125 wholesale to dealers.

All of the foregoing demonstrates a conflict in substantial evidence regarding the value of the insured property. It was the jury's function as fact-finder to weigh the evidence, to make credibility determinations, and to arrive at a figure representing the actual cash value of the insured property. We find that the jury's determination is supported by substantial evidence in the record as a whole and the judgment n. o. v. as to question 4 is reversed.

Since the jury determined the actual cash value of the property to be $165,000 and the property was insured for $280,800 and claimed to be worth $345,925, there remains for discussion the judgments n. o. v. as to questions 1 and 3, which raise issues of misrepresentation and concealment.

*Misrepresentations and Concealments in Acquiring the Insurance—Interrogatory 1*

The defendants' first affirmative defense, question 1, was predicated on section 627.-409 of Florida's Insurance Code, which provides that in applications and negotiations for insurance, misrepresentations, omissions, and concealment of facts will not prevent recovery unless they are:

(a) Fraudulent; or

(b) Material either to the acceptance of the risk, or to the hazard assumed by the insurer; or

(c) The insurer in good faith would either not have issued the policy or contract, or would not have issued it at the same premium rate, or would not have issued a policy or contract in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise.

Fla.Stat. § 627.409(1) (1981). On the basis that Jackson and Harris initially misrepresented the value of the property to be worth at least $180,000 (the coverage provided by the first three policies), later misrepresented it to be worth at least $280,800 (the aggregate coverage of all five policies), and concealed the purchase price and the

obsolescence of the tops, the trial judge ruled that recovery should be barred under all three subsections of the statute.

Under subsection (a) the trial judge ruled that Jackson and Harris knew that the actual cash value was no more than $10,000 and, consequently, their representations and their failure to disclose the purchase price indicated an intent to defraud the defendants. Jackson's testimony, however, establishes a reasonable basis for his valuation of the tops.[8] Based on that testimony, the jury could conclude that the representations were based on an honest belief as to the value of the property and were not made with an intent to deceive. The trial judge erred in holding otherwise.

Under subsections (b) and (c), the trial judge ruled that the actual cash value, the purchase price, and the obsolescence of the tops were facts material to the defendants' acceptance of the risk and that, if the true facts were known, the policies would not have been issued. The ruling is based on *Life Insurance Co. v. Shifflet*, 201 So.2d 715 (Fla.1967). Therein, the Florida Supreme Court interpreted the statute to mean that even innocent misrepresentations in insurance applications could bar recovery. *Id.* at 719.

The *Shifflet* opinion, however, has been circumscribed by *National Standard Life Insurance Co. v. Permenter*, 204 So.2d 206 (Fla.1967) (Ervin, J., concurring). *See Garcia v. Aetna Casualty & Surety Co.*, 657 F.2d 652, 655 n.2 (5th Cir. 1981) (explaining *Permenter* and subsequent cases). Justice Ervin's concurrence, joined by a majority of the court, states that "[e]ach situation where an alleged misrepresentation or incorrect statement is advanced to vitiate a policy should be examined to determine whether under the particular circumstances the applicant reasonably could be held responsible for the incorrect statement and

without fault on the part of the insurer." 204 So.2d at 207–08. The Justice indicated that in "excusable" situations, misrepresentations should not invalidate an insurance policy. *Id.* at 207. Two examples were given: (1) if the applicant "in good faith and without intent to deceive" makes "an erroneous expression of opinion or judgment" or (2) if the applicant gives an incorrect answer to a question "couched in language or refer[ring] to subjects and special fields beyond his ... understanding." *Id.; see also Gaskins v. General Insurance Co.*, 397 So.2d 729, 731 (Fla.App.1981). The Justice cautioned that statements of opinion must have some basis in fact.

> [C]ases involving excusable statements of judgment or opinion should not be analogized to those where an applicant makes careless or reckless statements positively as true when he has no knowledge as to whether such statements are in fact true, and as a fair and reasonable man should have indicated he was without sufficient knowledge to give an answer.

204 So.2d at 207.

The representations in this case were statements of opinion as to the value of the property. Whether they were good faith, albeit optimistic, estimates of value or whether they were in reckless disregard of the facts were questions for the jury. Moreover, it was reasonable for the jury to find nothing sinister in the failure to disclose to the defendants the purchase price and the fact that the tops were for older model cars. Jackson and Harris testified that during the negotiations for insurance they told their broker the purchase price, their estimate of the actual cash value, and provided him with samples of the tops. Gerald Goldstein, a witness for the defendants, testified that this information was not passed on to the defendant insurance companies.[9] Be that as it may, one conclusion

---

**8.** In addition to the testimony regarding the value of the tops, both Jackson and Harris testified that they informed their insurance broker that the second application for insurance of $100,800 was to cover 2,600 sets of roof moldings which they valued at $48 per set. This testimony was discredited by the trial judge as being self-serving and unsupported by other evidence in the record. The trial judge again

took too narrow a view of the evidence. Jackson and Harris could properly explain the basis of their valuation of the property; such testimony was relevant and admissible regarding the issue of intent.

**9.** Jackson and Harris used the services of an insurance brokerage firm to acquire the insurance. The brokerage firm in turn asked a li-

to be drawn from the testimony is that, under the circumstances, any nondisclosure was excusable. The jury's finding that no concealments or misrepresentations were made during the applications and negotiations for insurance coverage is reasonable and we cannot say that the verdict is unsupported by substantial evidence.

*Misrepresentations in the Proof of Loss and Under Oath—Interrogatory 3*

After the fire, Jackson and Harris submitted sworn proofs of loss to the insurance companies which stated that the actual cash value of the insured property at the time of the loss was $345,925. During an examination under oath conducted by the defendants, Jackson and Harris testified that at the time of the fire the vinyl auto tops they purchased from Pop's Vinyl Tops were worth $239,125.[10]

As their third affirmative defense, the insurance companies claimed that these statements were wilful misrepresentations which rendered the policies void. Each policy contained the following provision:

This entire policy shall be void, if, whether before or after a loss, the insured has wilfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the insured therein, or in case of any fraud or false swearing by the insured relating thereto.

Such a provision was discussed in *Chaachou v. American Central Insurance Co.,* 241 F.2d 889 (5th Cir. 1957). In conjunction with its holding that detrimental reliance was not a required element of proof for the defense of wilful misrepresentation, the Court made the following pertinent remarks:

This [holding] presents no danger that valuable rights will be lost by mere mistakes or errors in calculations, exaggerations in the amounts of the claims, or the assertion, even though doubtful, of coverage or other contentions as to all or particular items when these flow from the mistaken good faith judgment or opinion of the assured or his agents.... [T]he insurer must satisfy the heavy burden of establishing that the conduct complained of was done and was a wilful, purposeful misrepresentation of facts having substantial materiality under circumstances to which the law would attribute the intention to defraud, that is, cheat, deceive and cause the insurer to do other than that which would have been done had the truth been told.

*Id.* at 893 (citations omitted).

■ We have previously indicated that the evidence pertaining to actual cash value was in substantial conflict. Jackson and Harris were of the opinion that the insured tops were worth $239,125 and the total value of the insured property was $345,925.[11] Jackson's testimony regarding lot sales to automobile top installers supported their assertions. There was also evidence that the tops were not fast sellers and that in a prior transaction some of the tops had been valued at three dollars each. The jury was not

censed general insurance agent to obtain insurance coverage on the vinyl tops. The general insurance agent contacted a licensed surplus lines agent and the surplus lines agent arranged for the insurance coverage provided by the five defendants. The trial judge ruled that the brokerage firm and the general insurance agent were agents of the plaintiff, and were not agents of the defendants. *See Auto-Owners Insurance Co. v. Yates,* 368 So.2d 634 (Fla.App. 1979). In making this distinction, the trial judge apparently was ruling out any imputation of knowledge to the defendants. However, whether knowledge should be imputed to the defendants is not decisive of this issue. There was sufficient evidence for the jury to find that there was neither an intent to conceal nor a reckless failure to disclose. *See Permenter,*

204 So.2d at 206–07; *Cora Pub., Inc. v. Continental Casualty Co.,* 619 F.2d 482, 487 (5th Cir. 1980) (Florida law); *Roess v. St. Paul Fire & Marine Insurance Co.,* 383 F.Supp. 1231 (M.D. Fla.1974) (same).

**10.** They further testified that the roof moldings were worth $720,000. These valuations are consistent with the figures given in the bill of sale representing the transfer of ownership from Jackson and Harris to the plaintiff corporation.

**11.** The differing figures may be ascribed to Jackson's and Harris's belief that two of the insurance policies covered 2,600 sets of roof moldings. *See* note 8 *supra.*

required to accept Jackson's and Harris's estimates of the value of the property in order to return a verdict in favor of the plaintiff. *Badger Mutual Insurance Co. v. Morgan*, 313 F.2d 783, 785–86 (5th Cir. 1963). Based on the evidence presented, it was reasonable for the jury to conclude that, although Jackson and Harris may have overvalued the property, no purposeful, wilful misrepresentations were made. The judgment n. o. v. as to question 3 is reversed.

## II. The Alternative Order Granting A New Trial

■ This order was an exercise of the trial court's discretion and our review must be limited accordingly. *See, e.g., Cruthirds v. RCI, Inc.*, 624 F.2d 632, 635 (5th Cir. 1980); *Conway v. Chemical Leaman Tank Lines, Inc.*, 610 F.2d 360, 362 (5th Cir. 1980). The thrust of the order, however, appears to be the trial judge's concern that the jury's verdict did not square with the evidence presented at trial. The danger in such an order is that the trial judge may simply substitute his opinion of the evidence for the judgment of the jury. For that reason, a new trial may not be granted on such grounds unless the trial judge concludes that the jury's verdict is against the great weight, not merely the greater weight, of the evidence. *Conway*, 610 F.2d at 363; *Spurlin v. General Motors Corp.*, 528 F.2d 612, 620 (5th Cir. 1976). This standard embodies a concern that the jury's verdict should not lightly be disregarded. To further ensure against this danger, a stringent and searching review of the record is undertaken on appeal. *Conway*, 610 F.2d at 362–63; *Spurlin*, 528 F.2d at 620.

■ The trial judge in the present case ruled that the jury's verdict regarding all four interrogatories was against the great weight of the evidence. Although the trial judge was aware of the correct standard, our review of the record leaves us convinced that something of the trial judge's own suspicions entered into his analysis of the evidence presented to the jury.[12] The circumstances brought out at trial were undeniably suspicious, but we cannot say that the evidence supporting the plaintiff's case was negligible. In the context of the judgment n. o. v., we discussed exhaustively, and perhaps redundantly, the evidence relating to three of the interrogatories propounded to the jury. Further discussion is not warranted. Suffice it to say, with Jackson's testimony regarding the value of the tops added back into the picture, there was sufficient evidence for the jury to conclude that the actual cash value was greater than $10,000 and that, if misrepresentations were made, they were made under a good faith belief as to value. Although others might have accorded little or no weight to Jackson's testimony under such circumstances, this jury found it to be credible. That is a jury's function. The verdict as to those three issues was not against the weight of the evidence.

The remaining interrogatory, question 2, asked whether the plaintiff's representatives had procured the burning of the building in which the tops were stored.[13] A great deal of evidence was presented regarding the cause of the two fires and no

---

**12.** The following remarks by the Supreme Court, made in the context of a judgment n. o. v., are also pertinent to rulings on motions for a new trial.

It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable. That conclusion, whether it relates to negligence, causation or any other factual matter, cannot be ignored. Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.

*Tennant v. Peoria & Pekin Union Ry.*, 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520 (1944) (citations omitted).

**13.** Each insurance policy contained the following provision: "[T]his Company shall not be liable for loss occurring (a) while the hazard is increased by any means within the control or knowledge of the insured . . . ."

one disputes that they were intentionally set. Regarding the procurer of the fires, no direct evidence links the plaintiff corporation or its representatives, Jackson and Harris, to the fires. The defendants' case rested entirely on circumstantial evidence and on the deposition of William Noriega, who testified that Jackson, Harris, and their friend, George Garcia, admitted to setting the fires.[14] It could be inferred from the evidence presented by the defendants that Jackson and Harris, in need of cash, deliberately overvalued the tops in order to collect the insurance proceeds. It could be inferred from the evidence presented by the plaintiff that Jackson and Harris bought the tops at a bargain price from a business in financial distress and insured them for what they believed the tops to be worth. Against Noriega's deposition testimony stood Jackson's, Harris's, and Garcia's categorical denials.

There is no question that the defense of arson may be established solely by circumstantial evidence. "[W]here sufficient motive and opportunity of the insured to commit arson were combined with proof of an incendiary cause of fire, this court and others have considered the arson defense to be supportable by inference." *Cora Pub., Inc. v. Continental Casualty Co.*, 619 F.2d 482, 485 (5th Cir. 1980) (citations omitted). The key is whether there is *sufficient* evidence to support such an inference and that is normally a question which the jury must decide. Considering the evidence in the record as a whole, the conflict as to whether the tops were deliberately overvalued, and the significance of the witnesses' credibility to the outcome of this issue, we conclude that the jury's verdict was not against the weight of the evidence.

Although the trial judge's main concern appeared to be the weight of the evidence, the trial judge also rested the order on the grounds of improper and prejudicial conduct by plaintiff's counsel. Ordinarily, an order granting a new trial because of prejudicial error is left undisturbed on appeal because the trial judge occupies the best position from which to gauge the gravity of the error and its impact on the jury. *Cruthirds*, 624 F.2d at 635; *O'Neil v. W. R. Grace & Co.*, 410 F.2d 908, 914 (5th Cir. 1969). In this case, however, we have reviewed the cited instances of improper conduct and can only conclude that they are simply insignificant.

Four instances of improper conduct were cited. First, in his opening statement, plaintiff's counsel remarked that evidence would be produced to show that Noriega, a defense witness, took credit for starting the fires. Prior to the opening statements, the trial judge cautioned the jury that lawyers' comments are not evidence. The judge explained that the purpose of opening statements is to give the attorneys an opportunity to outline the evidence they expect to produce at trial. This isolated comment was made at the beginning of a five-day trial. During the trial evidence was produced indicating that a car observed at the scene of the fires was similar to Noriega's. The cross-examination of Noriega revealed that he had pled guilty to 35 counts of arson and related charges. During final arguments both sides talked at great length about Noriega. The plaintiff's position, and

**14.** Jackson and Harris testified that they and their families returned from Disney World on the night of February 9, 1976, to find that a fire had occurred in the building which housed the tops. The fire chief testified that the building was locked when the fire department arrived to put out the first fire and to gain access a door was removed from its hinges. Harris testified that he was the last person to leave the building on Friday, February 6; that he locked it; and that he, his wife, and three business associates possessed keys to the building. The defendants introduced evidence that there were outstanding judgments and liens against both Jackson and Harris, totaling approximately $27,000. William Noriega testified by deposition that Jackson and Harris informed him they had caused the fires to be set, that Harris had indicated the tops were over-insured, and that during a conversation with Harris and Garcia, Garcia explained how he had set the first fire and that the fire had to be set again after being extinguished by the fire department. Jackson, Harris, and Garcia testified that they had nothing to do with setting the fires. Furthermore, Jackson and Harris denied being in financial straits.

properly so, was that, given the fire was the work of an arsonist, it was the defendants' burden to prove that either the plaintiff, Jackson, or Harris was involved; the plaintiff was not required to prove that Noriega, or any one else, started the fires. Taking into consideration the length of the trial, the lack of any evidence besides Noriega's statements directly connecting Jackson and Harris to the fires, and Noriega's character flaws, it is inconceivable that the isolated comment cited by the trial judge prejudicially influenced the jury.

■ The trial judge cited "numerous leading and otherwise improper questions" as another example of prejudicial conduct. It is impossible to read the record in this case without becoming aware that the trial judge and counsel for plaintiff had a personality conflict. It is unfortunate that this happened, but it is also understandable. District court judges are overworked and they keep long hours. They expect a certain level of proficiency from the lawyers who try cases in our courts. When such is not forthcoming, a judge's difficult job becomes downright unpleasant. This lawyer, in addition to lacking a sharply-honed trial technique, had several irritating personal habits; one of which was a tendency to preface each utterance with, "Okay." [15] The trial judge's irritation caused him to repeatedly interrupt the attorney's examination of witnesses. In many instances no objection had been made by the defense counsel and the judge's interpretation of the attorney's question was incorrect. There is nothing in the record to substantiate the conclusion that the interruptions and interjections created sympathy for the plaintiff or bias against the defendants.

■ The last two cited instances of prejudicial conduct occurred during closing arguments. Plaintiff's counsel argued that there was no evidence that the plaintiff or its representatives concealed the purchase price from the defendants. During trial Jackson and Harris testified that they told their insurance broker the purchase price. He was the only person they talked to during the negotiations for insurance. The closing argument was proper comment on the evidence. The other cited instance was

---

15. For example, the following excerpt from the examination of John Jackson:

Q  Okay.  How many did you sell?
A  Sold Gene's Auto Upholstery, Florida Avenue, I sold him approximately 30 vinyl tops unpadded and sold him approximately 15 padded tops.
Q  For what price?
A  $18.50 and $60.00 on the padded tops.
THE COURT:  When was that?
THE WITNESS:  In 1975, December.
THE COURT:  Now, who sold them?
THE WITNESS:  Myself and James Harris.
MR. STAHL:  Okay.
BY MR. STAHL:
Q  Okay.  You and Harris owned these tops; is that correct?
A  Yes, sir.
Q  Okay.
A  I also sold the tops to Jack O'Neal's.
THE COURT:  Now—all right.  Go ahead.
BY MR. STAHL:
Q  Okay.  How many tops did you sell to Jack O'Neal's Top Shop?
A  Approximately 20 tops.
Q  Okay.  And what kind were they?
A  All unpadded tops.
Q  What did you sell them for?
A  $18.00.
Q  And what were auto top installers paying—

THE COURT:  No.  The question is, what was he paying?
BY MR. STAHL:
Q  No, no, no.  What were auto top installers paying, okay, let's say in the southeast, at this time, February of 1976, for unpadded tops in bulks of 20 or more?
A  18 to $21.00 a top.
Q  Okay.  What were they paying for Cadillac and Lincoln tops?
A  They were paying 175 to $200.00 a top.
Q  Okay.  What did you intend to sell the Cadillac and Lincoln tops for?
MR. GILLEN:  If it please the Court, we object to that.
THE COURT:  I have sustained the objection to that same question before and I sustain it again.
MR. STAHL:  Okay.  May we come forward?
THE COURT:  No, sir.
MR. STAHL:  Okay.
THE COURT:  I have ruled on that, I have heard you at length about it.  I don't intend to change my opinion or mind about the admissibility of it under the rules of evidence.
I have explained to you and no need for you to come forward.  Thank you.
Go ahead.
Rec., vol. 10, at 97–99.

that plaintiff's counsel argued that the plaintiff's insurance brokers were agents of the defendants. We find no such allusion in the closing arguments.

We conclude that the District Court exceeded the bounds of its discretion in granting a new trial on grounds of improper conduct.

This was a difficult, hard-fought trial. We can understand how the trial judge could have concluded in his own mind that Jackson and Harris had the fires set, many of the circumstances point in that direction. But that is precisely what juries are for. In this dispute, two juries heard substantially the same testimony and both juries made credibility choices to the contrary. There is no legal justification for requiring a third trial. The District Court's alternative order granting a new trial is reversed.

REVERSED and REMANDED with instructions to reinstate the jury's verdict.[16]

---

**16.** The relief requested by appellant is the reinstatement of the second jury verdict of $165,-000.