Richard WILLIAMS, Plaintiff-Appellant,

v.

The CITY OF VALDOSTA,
Defendant-Appellee.

No. 81–7107.

United States Court of Appeals,
Eleventh Circuit.

Oct. 21, 1982.

Fletcher Farrington, Savannah, Ga., for plaintiff-appellant.

George Talley, Valdosta, Ga., Terry A. Dillard, Waycross, Ga., for defendant-appellee.

Before HATCHETT and ANDERSON, Circuit Judges, and INGRAHAM,* Senior Circuit Judge.

R. LANIER ANDERSON, III, Circuit Judge:

Appellant Richard Williams filed this § 1983 action against his employer, appellee City of Valdosta, Georgia ("City"), alleging that the City abolished his job and demoted him because of his First Amendment activities. The district court granted the City's motion for judgment notwithstanding the verdict, and for a new trial in the alternative. The district court also denied Williams' motion for reinstatement and back pay. We reverse.

## I. FACTS

The evidence in this case demonstrates the following. Richard Williams first joined the Valdosta Fire Department in 1960 as a firefighter. At one time he assisted in writing a training manual containing the standard operating procedures for laying fire hoses during firefighting. Williams later was promoted to the rank of lieutenant. In 1969, he passed the test for promotion to line captain, ranking fourth on the list, but was not promoted as there were no vacancies at the time.

In 1970, Williams helped form the local firefighters union, serving as its first president from 1970 until 1976. About the time the union was formed, Williams began speaking out on many issues affecting the firefighters, including wages, fire department promotional practices, City recognition of the union as the firefighters' collective bargaining agent, and the lack of a formal personnel policy governing these and other issues. Williams' activities on these issues have taken many forms, including the filing of grievances, participation in meetings with the fire department and other city officials, statements to the press, organization of political forums for the questioning of candidates running for City governmental positions, and informational picketing of the Valdosta City Hall. Needless to say, Williams was often in verbal conflict with city officials, and these conflicts were highly publicized.

Williams' efforts have met with mixed success. For example, in 1973 the City created four new fire captain positions within the department. These positions remained vacant for quite some time, and Williams finally filed a grievance seeking to have the positions filled on the basis of promotional tests. Soon after the grievance was filed, however, the fire chief filled the four positions on the basis of seniority. Williams then filed a grievance challenging the failure to use promotional exams in filling these positions, citing the traditional use of such exams within the fire department as well as the formal requirement of such tests contained in the city personnel ordinance. In addition, he claimed that he and two other individuals who had passed the captaincy exam in 1969 deserved first consideration for these new captain positions. The fire chief's response to this grievance was to state that "I feel the appointments will honor and pay a little homage to the oldest men in grade in the department." In addition, the fire chief noted that at the time the 1969 exam had been held it was stipulated that any eligibility list resulting from the examination would be in effect for one year only, thus Williams' eligibility had expired. In a subsequent letter to Williams, the fire chief elaborated on his view that the positions had properly been filled by

---

* Honorable Joe Ingraham, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

qualified people on the basis of seniority. He further stated that "in the future when a promotion is available to us it will be on the same competitive basic [sic] as it has always been, unless there are some extenuating circumstances." In this letter he did not allude to the one-year eligibility requirement cited in his first letter.

Although Williams was unsuccessful in his prosecution of this grievance, his efforts resulted in the City taking action to institute specific promotional procedures to be used by the fire department. Thus, in February of 1975 a formal statement of fire department promotion policies was adopted by the City. This policy set up a fire promotion board and also instituted a series of promotional examinations to be administered by the board. Under this policy, examinations would be given periodically for promotion to various positions within the fire department, and on the basis of these examinations promotional eligibility lists valid for two years would be established. Vacancies then would be filled by taking the names at the top of the relevant eligibility list.

During the period in which Williams was challenging the 1973 promotions[1] he also was engaged in promoting a children's benefit to be performed at the Valdosta City Auditorium. Specifically, Williams and other members of the fire department were calling Valdosta residents and soliciting the purchase of tickets for the benefit. Soon after Williams had filed his second grievance relating to the 1973 promotions, he received a call from Police Chief Arnold informing him that this solicitation was in violation of a City ordinance. Williams noted that he and his fellow firemen were making these calls from outside of Valdosta; nonetheless, Williams stopped the phone solicitation. A few days later, however, Williams was summoned to court for the alleged violation of the phone solicitation ordinance. At this time the summoning

officer informed Williams that "he thought that the Mayor was pushing Chief Arnold to stop the telephone soliciting." Upon arriving at court Williams discovered that one complainant was a police officer and the other complainant was the wife of a police officer. Williams was duly convicted.[2]

In 1976, the traditional position of training officer within the fire department was upgraded to that of *captain* in charge of training ("training captain"), and a vacancy was created by the resignation of the current training officer. Williams took and passed a promotional exam at this time and was given the position of training captain. In this position, Williams was responsible for training all fire personnel in the proper procedures for fire prevention and suppression. In addition, he was required to give periodic exams to all members of the fire department, including lieutenants and captains. While Williams was training captain he was required to take the Georgia Fire Academy certification examination. His grade for this exam was a "94."

In 1979, Williams was again elected president of the firefighters local union. Soon after this, a suit was brought against the City by the former president of the union challenging the City's failure to validate promotional exams, as required by the City personnel management policy adopted in 1973.[3] Although Williams was not a party to this suit, he filed an affidavit in support of the plaintiff's position. Also at this time, and because of a change in his work schedule which made it more difficult for Williams to obtain part-time outside employment, Williams requested a transfer from training captain to the position of fire or "line" captain. This transfer was refused by the fire chief on the basis that it would constitute a demotion rather than a transfer.

At approximately the same time that Williams began seeking his transfer to fire

---

1. Williams' challenge lasted from late 1973 to early in 1975.

2. Eventually, Williams' conviction was overturned on appeal.

3. As distinct from the Departmental Policies adopted in 1975.

captain, the City Manager, Phin Horton, was beginning to draw up the 1979–1980 City budget. The City was then facing a fiscal crisis due to the Georgia Supreme Court's recent holding that the state's local option sales tax was unconstitutional. Thus, Horton was directed by the Mayor and City Council to bring in a balanced budget.

After receiving budget requests from each of the various City departments, Horton drafted a recommended City budget. Ultimately, Horton recommended the elimination of fourteen City positions. Most of these positions were to be eliminated by either attrition or transfer, and only three were slated for layoff. In particular, Horton's recommendation for the fire department was that two firefighters be laid off and the training captain be "transferred" to another position.

At the same time, however, Horton also recommended the creation of six and a half new positions, including one lieutenant's position in the fire department that had *not been requested* by the department head. In addition, the Mayor and City Council decided to retain three other positions that Horton had recommended be deleted, including the two firefighters for the city fire department. Further, the City Council decided to create three new positions in other departments that had not been recommended. The final budget as approved therefore eliminated eleven positions, including the position of training captain, primarily through attrition and transfer, and created almost as many new positions, including that of fire lieutenant.

Soon after Williams requested the transfer to fire captain, and during the budget process, the chief of the fire department stated to him "you are going to get what you asked for. . . . I reckon you are going to get your transfer." Approximately two weeks later Williams was notified that due to the budget his position as fire captain had been eliminated and replaced by a new position of fire lieutenant. As a result of this "transfer," which the City now concedes was a demotion, Williams' salary was substantially reduced.

From the City's point of view, elimination of Williams' job and the creation of the lieutenant's position to which he was demoted saved approximately $1,700. The record demonstrates, however, that the fire department was the *only* City department which received more money than the greater of either the City Manager's recommendation or the department head's request. Further, the fire department actually realized no decrease in the number of positions. Finally, at the time that Williams was demoted there was at least one vacancy in the position of fire captain. Although the City Manager held a hearing on the demotion at Williams' request, Williams obtained no relief.

Williams then filed suit in federal district court, seeking damages from the jury only for his "humiliation, loss of dignity and injury to his peace, happiness and feelings." The parties agreed that following the verdict, the district court would decide Williams' request for reinstatement and back pay. The jury found in favor of Williams and awarded him $25,000. The district court then granted the City's motion for a judgment notwithstanding the verdict, and a new trial in the alternative, and denied Williams' motion for reinstatement and back pay.

## II. ISSUES

This case involves four issues: (1) whether the City may be subjected to § 1983 liability for Williams' demotion; (2) whether the district court properly granted the City's motion for judgment notwithstanding the verdict; (3) whether the district court properly granted the City's motion in the alternative for a new trial; and (4) whether the district court properly denied Williams' request for reinstatement and back pay.

## III. SECTION 1983 LIABILITY OF THE CITY

As a threshold issue, the City argues that even assuming that Williams was demoted because of his First Amendment activities,

the City could be viewed as responsible for the demotion only under a theory of *respondeat superior*. The City correctly notes that the Supreme Court rejected such a theory as a basis for a municipality's liability under § 1983 in *Monell v. Department of Social Services*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). We conclude, however, that Williams' demotion derived from the type of municipal action that the *Monell* court held was subject to § 1983 liability.

■ Some dispute exists as to whether Williams was demoted (1) by the budget ordinance of the City, which abolished the training captain's position and created a new lieutenant's position into which Williams was demoted, or (2) by the City Manager, who informed Williams that the training captain's position was abolished and that Williams was being demoted to his former rank of lieutenant. In either case, however, the City is subject to § 1983 liability. With respect to the first theory, under which the City Council is viewed to have been the sole body that subjected Williams to his demotion, the *Monell* Court held that a municipality "can be sued directly under § 1983 ... where ... the action that is alleged to be unconstitutional implements or executes a[n] ... ordinance ... officially adopted and promulgated by that body's officers." 436 U.S. at 690, 98 S.Ct. at 2035–2036. No one argues that the budget ordinance here was not adopted and promulgated by the appropriate city officials. *See Familias Unidas v. Briscoe*, 619 F.2d 391, 404 (5th Cir. 1980) (citing *Kingsville Independent School District v. Cooper*, 611 F.2d 1109, 1112 (5th Cir. 1980) (school district liable for actions of board of trustees, because only way district court can practically and legally act is by and through board of trustees)).

With respect to the second theory, under which the City Manager is viewed to have been the sole individual that subjected Williams to his demotion, the *Monell* Court held

that a municipality also is subject to § 1983 liability for the "execution of a government's policy or custom ... made ... by those whose edicts or acts may fairly be said to represent official policy ...." 436 U.S. at 694, 98 S.Ct. at 2037–2038. Here, City Manager Horton is vested with final responsibility under the city's personnel ordinance for the demotion of City employees. Thus, his act of demoting Williams may fully be said to represent official city policy. *Schneider v. City of Atlanta*, 628 F.2d 915, 920 (5th Cir. 1980) (director of city agency); *Goss v. San Jacinto Junior College*, 588 F.2d 96, 98 (5th Cir. 1979) (president of junior college), *modified in part on other grounds*, 595 F.2d 1119 (5th Cir. 1979). Accordingly, we hold that the city is properly the subject of a § 1983 suit by Williams for his demotion.

## IV. JUDGMENT NOTWITHSTANDING THE VERDICT

■■ In *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the Supreme Court established the procedure governing a case involving a termination of employment that allegedly derives from the exercise of First Amendment rights. In the context of this case,[4] the *Mount Healthy* decision first required Williams to prove (1) that he engaged in conduct protected by the First Amendment, and (2) that this conduct was a substantial or motivating factor in the City's decision to abolish the training captain's position and to demote him to the lieutenant's position. After Williams established these two prerequisites, the burden then shifted to the City to prove that the City would have reached the same decisions as to the abolition and demotion even in the absence of Williams' protected conduct. 429 U.S. at 287, 97 S.Ct. at 576; *see Paschal v. Florida Public Employees Relations Commission*, 666 F.2d 1381, 1384 (11th Cir. 1982); *Wilson v. Taylor*, 658 F.2d 1021, 1027 (5th Cir. 1981); *Bickel v. Burkhart*, 632 F.2d

---

4. Although Williams suffered a demotion rather than a termination of employment, he is not foreclosed from § 1983 relief. *See Bickel v.*

*Burkhart*, 632 F.2d 1251, 1255 & n.6 (5th Cir. 1980) (denial of promotion is sufficient).

1251, 1255 (5th Cir. 1980). In addition, the standard that governs the issuance of a judgment notwithstanding the verdict is as follows:

> On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n.o.v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

*Boeing v. Shipman,* 411 F.2d 365, 374–75 (5th Cir. 1969) (en banc) (footnote omitted). We conclude that the district court improperly granted the City's motion for a judgment notwithstanding the verdict, and that Williams met the burdens imposed on him by the *Mount Healthy* decision.

■ First, the City agrees that Williams engaged extensively in conduct protected by the First Amendment. Second, Williams introduced sufficient evidence to create a jury question as to whether this conduct was a substantial or motivating factor in the abolition of the training captain's position and Williams' demotion to the rank of lieutenant.

It is not disputed that the City faced budgetary problems in early 1979; yet the City's overall handling of the situation and the specific result as to Williams raise reasonable suspicions. City Manager Horton recommended that the City abolish several employee positions. Despite the asserted budget crisis, however, several of the positions recommended for abolition were restored to the budget by the City Council. In addition, most of the positions that were approved for abolition either were vacant, or in the case of laborers, a high turnover position, were to be abolished pursuant to attrition. Williams was the only employee retained by the City who suffered a demotion.

In Williams' case the budget apparently created a new lieutenant's position into which he was demoted. The curious aspect of this position is that the fire department did not request it. Yet, the City created it despite the budget crisis. Thus, the only money saved from Williams' demotion was the approximately $1,700 differential between a lieutenant and training captain's pay. Aside from the new lieutenant's position, the fire department also benefitted from the City Council's rejection of the City Manager's proposed cut of two or three other firefighters from the budget. Indeed, the fire department evidently was the only City department to receive more money under the budget than either the department had requested or the City Manager had recommended.

In addition to the budgetary crunch, the City also contends that Williams simply was not qualified for the line captain's position because he had not taken a line captain's promotional exam, or if he had, his eligibility had expired by the time of his demotion. Through this argument, the City attempts to justify its failure to place Williams into one of the line captain positions that was vacant at the time of Williams' demotion.

Williams first passed a captain's exam in 1969, ranking fourth on the list. The eligi-

bility period for this list was only a year; thus, under the formal promotional policies adopted in 1975, Williams would have had to take another captain's examination in order to be promoted. However, Williams showed that with respect to at least one promotion after the adoption of the fire department policy, a lieutenant's position was filled by reference to expired eligibility lists, which in turn derived from examinations given before the adoption of the promotional policy.

Williams also presented evidence that the City's own personnel policy had largely been ignored in the past. For example, at the time the 1973 promotions to captain were made on the basis of seniority there was a longstanding tradition in the department that such promotions would be made only on the basis of competitive examinations. Further, he cites the City's own personnel policy ordinance, adopted early in 1973, as requiring promotions city-wide on the basis of examinations. In his 1974 response to Williams' grievance relating to the promotions to captain based on seniority, the fire chief asserted that he was making the promotions on the basis of a rule which stipulated a preference for incumbents when a position is "reclassified." In that same response, however, the fire chief stated that the positions vacant in 1973 had just been *created* by the Mayor and City Council. In another letter, the City Manager *conceded* that these vacancies were not reclassified but were newly created. Further, the City introduced no evidence demonstrating that subsequent promotions have occurred in strict adherence to either the City's or the fire department's formal promotional policies.

In addition to the 1969 captain's examination, Williams took another examination in 1976, which resulted in his promotion to the training captain's position. Whether or not this examination was a "captain's exam," thus entitling Williams to have been offered a line captain's position at the time the training captain's position was abolished, was a matter of some dispute at trial. However, this dispute centered largely on the issue of credibility, an issue that Wil-

liams was entitled to have resolved in his favor on a motion for judgment notwithstanding the verdict. *Boeing Co. v. Shipman,* 411 F.2d at 375–76.

Williams testified that this 1976 exam was indeed a "captain's exam," and further that the examination was indistinguishable from the exam for captain he had taken in 1969. Williams would seem to have some specialized knowledge of the contents of promotional examinations. He served on the fire department's promotional board, which was established as part of the 1975 adoption of a formal promotional policy, and which was involved in the preparation of fire department promotional examinations. His version of the facts is bolstered by a memorandum from the fire chief to the departmental personnel, apparently concerning in part the 1976 examination that Williams took. This memo announces the giving of various promotional examinations, in part to establish "eligibility lists for captains" and to fill a vacancy in the position of "captain in charge of training." This memo suggests that Williams indeed took a "captain's exam" in 1976, making him eligible for any captain's position, either line captain or training captain. There was some testimony opposed to this view of the facts, but again, we must resolve credibility conflicts in favor of Williams.

One additional piece of evidence supports the view that Williams was eligible for a line captain's position by virtue of his 1976 examination. In March, 1979, during his tenure as a training captain, Williams asked for a "transfer" to a vacant line captain's position. According to the City's personnel policy, a "transfer" is a job change without a salary change. A "demotion" is a change to a lower-paying job. A line captain is paid less than a training captain. On this basis, the fire chief denied Williams' request, stating that Williams should have requested a demotion, not a transfer. Williams was fully aware that this job change involved a cut in pay. However, the fire chief's technical application of the personnel ordinance seems a little odd, particularly when he could have informed Williams that

he simply was not eligible for a line captain's position, if the fire chief considered (1) Williams' 1976 test not to be a "captain's test," or (2) Williams' eligibility under this test to have expired. That the fire chief selected a technical ground for rejecting Williams' job change request, rather than the type of test or expiration of eligibility grounds urged by the City here, casts doubt on the City's position.

The City also argues that the fire department's "custom" or "policy" was that a training captain would be placed back into his old position upon leaving the training captain's position. Only two individuals ever occupied the training captain's position, however: Williams, and before him, Hollis Rump. Rump testified that his understanding when he took the training captain's position was that when he left that position, he would return to his old, lower paying job, of line lieutenant. However, unlike Williams, Rump never took a captain's test either before or during the time he served as training captain. As discussed earlier, Williams introduced sufficient evidence to demonstrate that he had taken a captain's test that entitled him to a change to a line captain's position upon the abolition of the training captain's position. This evidence also indicates that if a "policy" of returning a former training captain to his old position ever existed, such policy was changed or abandoned by the time Williams assumed the training captain's position.

Finally, Williams introduced substantial evidence of his qualifications for the position of line captain. He passed the captain's exam in 1969, and his position as training captain required that he have as much knowledge of fire prevention and suppression as any of the personnel in the fire department. In this position he was required to prepare training programs and examinations for most firefighting personnel, including lieutenants and line captains. Further, it was the practice within the department that whenever the Assistant Chief was absent the captain highest in seniority would serve in his stead, discharging all of his duties and obligations. During his tenure as training captain this responsibility devolved upon Williams on many occasions.

Moreover, there was ample evidence from which the jury could infer that the City demoted Williams in retaliation against him for exercising his First Amendment rights, including his recent filing of the affidavit in support of the suit challenging the City's promotion policies.

In sum, we hold that under the *Boeing Co. v. Shipman* standards the district court improperly granted the City's motion for a judgment notwithstanding the verdict. Williams introduced sufficient evidence to create a jury question under each portion of the *Mount Healthy* test.

## V. GRANT OF A NEW TRIAL

■ In addition to granting defendant's motion for a judgment notwithstanding the verdict, the trial court granted a new trial in the alternative, based on the insufficiency of the evidence in plaintiff's favor.[5] Ap-

---

5. The district court also mentioned the admission of certain evidence in support of the grant of a new trial: (1) various newspaper articles concerning Williams' First Amendment activities, and (2) Williams' testimony concerning his arrest for the telephone solicitation of the public for the purchase of tickets to a children's show evidently sponsored by the firefighters' union. On appeal, the City relies solely on the weight of the evidence and does not argue in the alternative that the admission of the foregoing evidence supports the grant of the new trial. Accordingly, we assume the City has abandoned the evidentiary ground, and we treat the district judge's decision as one grant-

ing a new trial solely on the basis of insufficiency.

Moreover, we cannot perceive how any of the evidence cited by the trial court could properly support the granting of a new trial. As to the newspaper articles, some of the evidence as to Williams' statements was cumulative. In addition, many of the statements in the articles were *not hearsay* because they were offered not to prove the truth of the matter asserted, but to show that Williams made statements, whether true or not, that could be considered critical of the City government's policies. Fed. R.Evid. 801(c). Further, if the City was concerned with statements made by individuals

pellant now contends that the granting of this motion constituted an abuse of discretion, for which this court may reverse the district court's ruling. We agree.

A trial judge may grant a motion for a new trial if he believes the verdict rendered by the jury was contrary to the great weight of the evidence. "Although a trial judge cannot weigh the evidence when confronted with a motion [for judgment] notwithstanding the verdict, in a motion for a new trial the judge is free to weigh the evidence." *Rabun v. Kimberly-Clark Corp.*, 678 F.2d 1053, 1060 (11th Cir. 1982) (citing *King v. Exxon Co.*, 618 F.2d 1111, 1115 (5th Cir. 1980)). The trial court, however, must find the verdict contrary to the great, and not merely the greater, weight of the evidence.[6] *Rabun v. Kimberly-Clark Corp.*, 678 F.2d at 1060; *J & H Auto Trim Co. v. Bellefonte Insurance Co.*, 677 F.2d 1365 (11th Cir. 1982); *Evers v. Equifax, Inc.*, 650 F.2d 793 (5th Cir. 1981) (Unit B); *Conway v. Chemical Leaman Tank Lines, Inc.*, 610 F.2d 360 (5th Cir. 1980); *Cities Service Oil Co. v. Launey*, 403 F.2d 537, 540 (5th Cir. 1968). Finally, when independently weighing the evidence, the trial court is to view not only that evidence favoring the jury verdict but evidence in favor of the moving party as well. *See Rabun v. Kimberly-Clark Corp.*, 678 F.2d at 1060.[7]

other than Williams, or with other inadmissible material in the articles, it could have requested a limiting instruction to the jury that would have made clear that the newspaper coverage was admitted only to show Williams' First Amendment activities, and not for any other purpose. The City made no such request at trial. In addition, the newspaper articles were not such as to inflame the jury or cause undue bias against the City so that a limiting instruction could not have cured any prejudice.

As to the telephone solicitation, again we cannot see how the City was unduly prejudiced. Indeed, if any prejudice occurred, it appears to have been rather evenly balanced against both sides. Williams did testify that the mayor "pushing" the police chief to have the solicitation stopped, suggesting perhaps that the City was harassing Williams. Yet, although Williams attempted to give an innocent explanation for his activities, he admitted that he was convicted in court for violating a City ordinance prohibiting telephone solicitation. Thus, his testimony was probably more prejudicial to Williams than to the City.

In sum, we fail to see how the City in this case was sufficiently prejudiced by the admission of the evidence discussed above to warrant a new trial.

6. In contending that the jury's verdict was against the "greater weight of the evidence," the appellee thus misstates the applicable standard. *See* Brief for Defendant-Appellee, at 15–16.

7. Apparently, there is disagreement over whether the trial judge is permitted to make credibility choices when weighing all the evidence. *Compare King v. Exxon Co.*, 618 F.2d at 1116 (granting great deference to trial court's first-hand experiences of witnesses and their demeanor); *Conway v. Chemical Leaman Tank Lines, Inc.*, 610 F.2d at 362 (discussing credibility of witnesses); *Wyatt v. Interstate &* *Ocean Transport Co.*, 623 F.2d 888, 891 (4th Cir. 1980) (trial court may weigh evidence and consider credibility of witnesses) (dictum); *with J & H Auto Trim Co. v. Bellefonte Insurance Co.*, 677 F.2d at 1373 & n.12 ("Although others might have accorded little or no weight to ... [the witness'] testimony under such circumstances, this jury found it to be credible. That is a jury's function. The verdict as to those three issues was not against the weight of the evidence.") (relying on Supreme Court JNOV case, *Tennant v. Peoria & Pekin Union Railway*, 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520 (1944)); *Lind v. Schenley Industries, Inc.*, 278 F.2d 79, 90–91 (3d Cir.) (concluding that substitution by court below of its judgment for that of jury on issue of witness credibility constitutes abuse of legal discretion), *cert. denied*, 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960). Moore's treatise states the following:

> There are statements in the cases that, in ruling on the motion, the trial judge acts as a 13th juror. Properly understood and applied, no fault can be found with them for the judge does act to evaluate and weigh the evidence. But while he has a responsibility for the result no less than the jury, he should not set the verdict aside as against the weight of the evidence merely because, if he had acted as trier of the fact, he would have reached a different result; and in that sense he does not act as a 13th juror in approving or disapproving the verdict. *And since the credibility of witnesses is peculiarly for the jury,* it is an invasion of the jury's province to grant a new trial merely because the evidence was sharply in conflict.

*Moore's Federal Practice,* ¶ 59.08[5], at 59–158–59 (citations omitted) (emphasis added).

In our view, the authorities suggest that the trial judge should not substitute his own credibility choices and inferences for the reasonable credibility choices and inferences made by the

Courts fairly agree, however, that in certain situations a trial court should grant greater deference to a jury verdict. Thus, when the trial involves simple issues, highly disputed facts, and there is an absence of "pernicious occurrences," trial courts should be considerably less inclined to disturb a jury verdict. Accordingly, review of motions that have been granted in such cases will be more rigorous. On the other hand, in cases involving complex issues, facts not highly disputed, and events arguably marred by error, trial courts have more freedom to evaluate independently the verdict. *See Conway v. Chemical Leaman Tank Lines, Inc.,* 610 F.2d at 367; *O'Neil v. W. R. Grace & Co.,* 410 F.2d 908, 913–14 (5th Cir. 1969); *Lind v. Schenley Industries, Inc.,* 278 F.2d at 90–91; 11 Wright and Miller, *Federal Practice and Procedure,* § 2806, at 44.

When reviewing a trial court's disposition of a motion to grant a new trial, we apply the abuse of discretion standard. *See Rabun v. Kimberly-Clark Corp.,* 678 F.2d at 1060; *National Service Industries, Inc. v. Hartford Accident & Indemnity,* 661 F.2d 458, 461 (5th Cir. 1981) (Unit B); *Evers v. Equifax,* 650 F.2d at 796–97; *Conway v. Chemical Leaman Tank Lines, Inc.,* 610 F.2d at 362–63. The cases, however, maintain two important distinctions that courts should note when reviewing new trial motions. First, if the trial court granted the motion for a new trial, review by the appellate court is more stringent. *See Rabun v. Kimberly-Clark Corp.,* 678 F.2d at 1061; *Evers v. Equifax,* 650 F.2d at 796–97; *J & H Auto Trim Co. v. Bellefonte Insurance Co.,* 677 F.2d at 1373; *National Service Industries, Inc. v. Hartford Accident & Indemnity,* 661 F.2d at 461; *Conway v. Chemical Leaman Tank Lines, Inc.,* 610 F.2d at

362–63. Secondly, although the abuse of discretion standard governs regardless of the grounds for which the new trial was requested, review by the appellate court will be more rigorous when the basis for the motion was the weight of the evidence:

> [W]hen the trial court delivered the jury from a possibly erroneous verdict arising from circumstances over which the jury had no control ... there is no usurpation by the court of the prime function of the jury as the trier of the facts and the trial judge necessarily must be allowed wide discretion in granting or refusing a new trial.
>
> But where no undesirable or pernicious element has occurred or been introduced into the trial and the trial judge nonetheless grants a new trial on the ground that the verdict was against the weight of the evidence, the trial judge in negating the jury's verdict has, to some extent at least, substituted his judgment of the facts and the credibility of the witnesses for that of the jury .... It then becomes the duty of the appellate tribunal to exercise a closer degree of scrutiny and supervision than is the case where a new trial is granted because of some undesirable or pernicious influence obtruding into the trial.

*Lind v. Schenley Industries, Inc.,* 278 F.2d at 90; *see National Service Industries, Inc. v. Hartford Accident & Indemnity,* 661 F.2d at 461 (more probing review applies to grant of new trial, *especially* when based on weight of evidence grounds).

In the case before us, both these factors are present. The trial court *granted* the motion for the new trial because it viewed the verdict as against the weight of the evidence. Thus, this court should take a stricter view of the trial court's action.[8] If

---

jury. *See J & H Auto Trim Co. v. Bellefonte Insurance Co.,* 677 F.2d at 1373.

8. This is not to say that in cases such as this we apply a standard other than abuse of discretion. Rather, when the trial judge dismisses a jury verdict solely because in his view the evidence was insufficient, it is *more likely* that he has abused his discretion: fact-finding is the province of the jury, and there is no doubt that

all evidence was properly before the jury and that the proceedings were decorous. On the other hand, when such a motion is granted on the basis of legal error or prejudicial conduct, the trial judge is not ruling that the jury was incorrect in its assessment of the case as presented. Rather, his decision amounts to a finding that due to errors occurring at trial *no* verdict could have been arrived at properly. In such a case it is entirely proper that the trial

the record further discloses that the issues were relatively simple and the facts hotly contested, then we also would be correct in holding the trial court to a slightly higher standard, or at least ensuring that the court held *itself* to that higher standard.

In light of our lengthy recitation of the facts earlier in this opinion, we need only summarize the evidence and the reasonable inferences on both sides. The City concedes that Williams engaged extensively in protected First Amendment activity. From the difficulty he encountered in seeking to effect basic policy changes, it is reasonable to infer that City officials viewed him as somewhat of a "thorn" in their side, through the years, and that they may have intended to retaliate against him for his activities.

On the other hand, no one disputes the seriousness of Valdosta's fiscal situation in 1979 due to the loss of revenues. Moreover, it is clear that the city properly could seek to reduce its outlays through personnel cuts, whether they be transfers, demotions, or lay-offs. Thus, there is also a reasonable inference that Williams was but an unlucky casualty in the battle to balance the budget.

However, much of the undisputed evidence suggests that Williams was a rather *unique* casualty. Of the few positions that were eliminated, only three were lay-offs. All others were by either attrition or transfer. This means that only Williams and the three individuals laid off actually suffered any decrease in income. In fact, every other employee in Valdosta, including those whose positions were slated for elimination through attrition or transfer, realized a pay *increase,* either because they were due for a step increase or because of an across-the-board salary increase in the new budget.

Moreover, Williams' plight is that much more unique when viewed in the context of the fire department. This was the only department whose budget when approved was higher than that either requested by the department or recommended by the City Manager. In addition, the number of positions in the department remained the same, and a lieutenant's position was created for Williams despite an already existing vacancy. These circumstances reasonably permit an inference of retaliatory motive.

On the other hand, the City Manager testified that the position of training captain was a luxury position, and that Williams' responsibilities could be discharged by regular line officers. In fact, since his position was eliminated, training in the department is performed by all such officers. From this testimony, one could surmise that the City properly focused on the desirability of the position involved and not the desirability of the person occupying that position.

However, the City could have transferred Williams to a then-vacant fire captain's position rather than demoting him. The evidence reasonably supports the conclusion that Williams was qualified to be fire captain by virtue of his responsibilities as training captain, his service from time to time as acting assistant chief, and his having passed previously *at least* one and probably two captain's exams.

The City's fire department promotional policy, however, provides evidence of a basis for denying Williams a captain's position: he had not passed a promotional exam in the two years preceding the vacancy. It is undisputed, however, that the City's adherence to its formal promotional policy was inconsistent and arbitrary at best. This inconsistency supports the conclusion that resort to the examination requirement was a pretext for singling out Williams for unfavorable treatment. This inference is further supported by the episode involving

---

court be allowed to correct its own errors; in doing so, the court is actually *safeguarding* the role of the jury by ensuring that to the greatest extent possible the trial process will succeed in revealing to the jury those facts that are necessary to arrive at a verdict. Because the trial judge is actually present at trial, and best able to determine whether the proceeding has been "contaminated" by events outside the jury's control, his decision to grant a new trial because of legal error, prejudicial conduct, or pernicious behavior is less likely to constitute an abuse of discretion. Accordingly, we will be more hesitant in overturning the grant of a new trial based on such grounds.

Williams' conviction for phone solicitation, as well as by the timing of Williams' demotion, occurring soon after the lawsuit against the City of Valdosta was instituted by the former president of the union and supported by Williams.

The foregoing summary of the evidence on both sides, as well as the evidence discussed in parts I and IV of this opinion, clearly demonstrates that every issue in this case has been hotly disputed. Both sides introduced testimonial and documentary evidence supporting their version of the facts. Further, reasonable inferences to support both sides may be drawn from much of the evidence. On the other hand, the primary issue before the jury was relatively simple: was Williams demoted for exercising his First Amendment rights? In such a situation the law requires the greatest deliberation on the part of the trial court before it grants a new trial on the ground that the verdict was against the great weight of the evidence.

 Having carefully reviewed the record, and according the trial court's assessment of the evidence the deference appropriate in this context, we are left with the inescapable conclusion that "there *is* no great weight of the evidence in any direction." *Conway v. Chemical Leaman Tank Lines, Inc.,* 610 F.2d at 367 (emphasis in original). Accordingly, we hold that the trial court abused its discretion in granting a new trial in the alternative.

## VI. EQUITABLE RELIEF

Williams instituted this suit seeking reinstatement and back pay as well as damages.

Prior to trial, and with the consent of counsel for both parties, the issues of reinstatement and back pay were reserved for the court. Thus, after the district court entered its order granting the defendant a judgment notwithstanding the verdict and a new trial in the alternative, it denied Williams' request for equitable relief. Williams now challenges this denial.

At the outset, we note that the alleged stipulation between the parties does not appear in the record.[9] Nonetheless, the City contends that the parties agreed that the trial court would consider the jury's resolution of Williams' legal claim as advisory only. Thus, the City argues that the jury's verdict on Williams' claim for damages was not binding upon the trial court when determining Williams' claim for equitable relief, and that we should affirm the factfindings of the trial court with respect to equitable relief, notwithstanding the jury verdict to the contrary.

 We agree that it was entirely proper for the trial court upon consent of the parties to reserve for its own consideration the determination of Williams' claim for equitable relief.[10] Here, our agreement with the City ends. First, our decision thus far requires reinstatement of the jury's verdict in favor of Williams. Second, all findings necessarily made by the jury in awarding the verdict to Williams are binding on the parties as well as on the trial court.[11] Third, the jury necessarily determined that Williams engaged in protected First

---

9. Both parties alluded to the stipulation in their briefs, and the trial court mentions the stipulation in its order denying Williams equitable relief. Record on Appeal, at 92.

10. Fed.R.Civ.P. 39(b); 9 Wright and Miller *Federal Practice and Procedure,* §§ 2336–37, at 129 31.

11. The Seventh Amendment requires that when a cause of action involves legal and equitable claims, "only under the most imperative circumstances . . . can the right to a jury trial of legal issues be lost through prior determination of equitable claims." *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 510–11, 79 S.Ct. 948, 956 957, 3 L.Ed.2d 988 (1959); *see Thermo-*

*Stitch, Inc. v. Chemi-Cord Processing Corp.,* 294 F.2d 486, 489–91 (5th Cir. 1961). This constitutional requirement ensures that the parties will not be barred from contesting those issues normally triable to a jury simply because the court itself determined those issues while sitting in equity. Conversely, to the extent that the legal and equitable issues overlap, the court when sitting in equity will be bound by the jury's prior determination of the legal issues. *See Ingraham v. Wright,* 498 F.2d 248, 266 (5th Cir. 1974), *aff'd,* 525 F.2d 909 (5th Cir. 1970) (en banc); *aff'd,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977).

Amendment activities, that this was a substantial motivating factor in the City's determination to demote him, and that the City has not shown that Williams would have been demoted regardless of his activities. (T–200) (Jury Instructions).

 In this circuit, the law is clear that a plaintiff so discriminated against in the employment context is normally entitled to reinstatement and back pay, absent special circumstances warranting the denial of equitable relief. *See Kingsville Independent School District v. Cooper,* 611 F.2d 1109, 1114 (5th Cir. 1980); *Lee v. Washington County Board of Education,* 625 F.2d 1235, 1239 (5th Cir. 1980); *Davis v. Board of School Commissioners of Mobile County,* 600 F.2d 470, 474 (5th Cir. 1979), *vacated in part on other grounds,* 616 F.2d 893 (5th Cir. 1980); *McCormick v. Attala County Board of Education,* 541 F.2d 1094, 1095 (5th Cir. 1976); *Mims v. Wilson,* 514 F.2d 106, 109–11 (5th Cir. 1975); *Sterzing v. Fort Bend Independent School District,* 496 F.2d 92, 93 (5th Cir. 1974); *accord, Jannetta v. Cole,* 493 F.2d 1334, 1338 (4th Cir. 1974); *see Clary v. Irvin,* 501 F.Supp. 706, 712–13 (E.D.Tex.1980). Because the jury, whose verdict we reinstate, necessarily found those facts which normally trigger the remedies of reinstatement and back pay, and because the City has pointed to no circumstances that would justify denying such relief, the district court should have granted Williams' claims for equitable relief.

However, the City suggests that there was a stipulation between the parties that the jury verdict would be advisory only and would not bind the trial court as to the facts. We find no such stipulation in the record. The record reveals only that the equitable issues of reinstatement and back pay would be "reserved for the court." Record on Appeal, at 92. Under the law discussed above, such reservation means that the trial court would exercise its limited discretion to determine the propriety of

equitable relief *based on the facts as found by the jury.*[12]

Accordingly, the district court erred in denying Williams' claims for equitable relief.

## VII. CONCLUSION

On the basis of the foregoing discussion, the decision by the district court is reversed in all respects. On remand the court will enter a judgment reinstating the jury verdict in favor of Richard Williams, and will grant equitable relief consistent with this opinion.

REVERSED AND REMANDED.

---

12. Moreover, we do not read the district court's decision as ignoring the binding effect of the jury's verdict. Having erroneously set aside the jury's finding of facts, the district court naturally denied Williams relief based upon its *substituted* findings. We do not presume that the court would have ignored the jury's findings had it upheld the verdict.