[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-10883

Non-Argument Calendar

_____

ERIC EWING,

                                                        Plaintiff-Appellee,

*versus*

CARNIVAL CORPORATION,

                                                        Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:19-cv-20264-JG

_____

Before ROSENBAUM, BRANCH, and GRANT, Circuit Judges.

PER CURIAM:

Eric Ewing was injured while a passenger on a Carnival cruise when a stored bunk bed swung open and hit him on the head. Ewing sued, and the case was tried to a jury. At trial, Ewing presented expert testimony suggesting that Carnival had failed to either (1) lock the bunk bed into place or (2) stow the bunk bed so that the locking mechanism could work.

Carnival sought to undermine the credibility of Ewing's expert by showing him, and the jury, a video of a Carnival employee wedging a different bunk bed open with a butterknife.

Though the trial court at first permitted this, it soon had a change of heart. The court first issued a curative instruction while the jury was deliberating. Then, after the jury returned a no-liability verdict for Carnival, the trial court granted Ewing's motion for a new trial. The trial court reasoned that the video was unauthenticated, did not meet the standards for demonstrative evidence, and improperly injected the notion that Ewing himself had tampered with the bunk bed and then lied about it—despite Carnival disavowing that theory before trial. The case was later re-tried and the second jury returned a verdict for Ewing.

Carnival appeals, arguing that the trial court abused its discretion in granting a new trial because its late-breaking qualms about the video do not apply to impeachment evidence. At a

minimum, Carnival suggests, the trial court's curative instruction was sufficient to prevent or cure any prejudice to Ewing.

We disagree. Even if the district court's concerns about the evidence came mostly from rules typically applied to *substantive* evidence, not impeachment evidence, the concerns are well taken as an application of Federal Rule of Evidence 403. The trial court was reasonably concerned that the video had limited value as impeachment evidence, and yet posed a substantial risk of introducing a previously disavowed theory into the jury's consideration of a closely disputed question (how, exactly, the bunk bed fell). And by that same token, the trial court had good reason to conclude that simply instructing the jury to consider the video for the purpose it was offered was insufficient. Thus, while the trial court did not expressly couch its grant of the new trial in Rule 403 terms, we exercise *our* discretion to affirm its decision on this alternative ground supported by the record.

## I.     Background

Ewing was a passenger on a Carnival cruise vessel "Ecstasy" when he was injured by a bunk bed falling out of its stowed position and hitting him in the head. He was injured when, while sitting on his bed in his cabin, the bunk-bed supposedly secured above him came unlatched and swung open, hitting him on the head. After the incident, Ewing checked the bunk bed on the opposite wall and found that it, too, was not secured and could be opened without the key.

Ewing filed this lawsuit, alleging negligence against Carnival Corporation. After the court denied cross motions for summary judgment, the case went to trial.[1]

At trial, the plaintiff's theory was that the cabin steward had not (1) properly locked the bed into place, or (2) properly pushed the bed into place in order to lock it. Carnival's defense was that its steward had exercised due care in locking and checking the bunk beds, and the screws for the storage compartment had simply come loose (through no fault of Carnival's). Carnival did not argue that Ewing was to blame for his own accident; in fact, Carnival expressly disavowed advancing any theory that Ewing's version of events was fraudulent—instead noting that a jury could always choose not to believe his version of events.

Ewing advanced his theory through the testimony of Dr. Srinivas Kadiyala. Dr. Kadiyala testified that the bunk would not lock in place if it was not pushed far enough into the wall. In particular, if the bunk was not pushed far enough into the wall, the latch used to lock the bunk would be *in front* of the bracket used to lock the bed in place, rather than behind it. In Dr. Kadiyala's opinion, the bunk was not locked so that the latch plate was *behind* the bracket, causing the bunk to fall open.

Both in his report and in his testimony, Dr. Kadiyala used the term "tamper-resistant" to refer to the locking mechanism for the

---

[1] The parties stipulated that the case would be presided over and tried by United States Magistrate Judge Jonathan Goodman.

bunk bed.  Carnival cross-examined Dr. Kadiyala, seeking to show that the bunk locks could be tampered with:

> Q. One explanation as to how the bunk came down is Mr. Ewing opened them?
>
> A. With what? It's a tamper-resistant key.
>
> Q. So you are ruling that out because you are calling it a tamper-resistant lock?
>
> A. I am not calling it, sir. From an engineering point of view, that is what it is. If you want, I will be happy to explain the . . . principles of what makes this a tamper-resistant lock.

Carnival then sought to impeach Dr. Kadiyala using a cell phone video showing that the bunk bed "can be unlocked without the key[.]"  As the trial judge explained, "the video shows an apparent security officer walk into a room, take out a pry bar-type device (which Carnival's counsel then says is a knife) and shove it" into a "slight gap" in the bunk assembly "and pry it open."  The district court watched the clip, and then ruled (over Ewing's objection) that Carnival could use the video clip to question Dr. Kadiyala.

After the video was played for the jury, Carnival asked Dr. Kadiyala: "So, Doctor, the bunk can be tampered with to open it, right?"  Dr. Kadiyala answered: "Tamperproof is a lock, sir. I can break into your car too with a jimmy.  It's designed to be locked, designed to be a certain way.  A lock is a tamperproof lock. That's

what it's called.  This would be characterized as vandalism."  The trial court denied Carnival's request to introduce the cell phone video into evidence.  It also denied Ewing's request for a curative instruction.

Carnival referenced the video in closing arguments, telling the jury that it showed Ewing's theory of the case was flawed:

> The other thing Kadiyala relies on for his conclusion that [the cabin steward] had to have not locked [the bunk bed] is his testimony this was a tamper-proof lock, remember? *Tamper-proof lock. The only way it can be opened* and the bunk deployed *is with the key*. But you, as judges of the facts, *saw otherwise*. You saw the gap that exists above the lock plate on the face of the bunk bed.
>
> . . . .
>
> Do you remember seeing this during the witness's testimony? . . . . *you also saw that by use of a butter knife, that lock can be opened without a key. You saw the video of that when . . . Kadiyala was testifying.*

(emphasis added).

A few days later, after the case had been submitted to the jury for deliberation, the trial court announced that it would give a curative instruction.   The trial court rejected a proposed instruction from Ewing telling the jury to "completely disregard [the] video," instead instructing the jury as follows:

23-10883                Opinion of the Court                7

> Ladies and gentlemen of the jury, you will recall that during the cross-examination of Srinivas Kadiyala, [Ewing's] expert engineer, defendant Carnival played a cell phone video showing a Carnival security guard forcibly open[ ] a locked bunk bed without a key.
>
> Carnival has not presented any specific evidence about the circumstances under which the video was made or about the locking mechanism shown in the video.
>
> It is up to you, as judges of the facts, to determine what weight, if any, to give to this video for the limited purpose which Carnival wanted to accomplish with this video, namely to try to impeach Dr. Kadiyala regarding his testimony that the bunk bed lock was tamper-proof.
>
> In making that determination, you should consider the instruction that your verdict may not be based on speculation or conjecture.

The jury returned a no-liability verdict for Carnival. Ewing moved for a new trial, arguing (among other things) that the use of the cell phone video required a re-trial.

At that point, the trial court's change of heart was complete, and it granted Ewing's motion. The court explained that Ewing's motion and its ruling "[were] not based on an insufficiency of evidence argument." "Instead, [they were] based (in part) on legal error concerning the presentation of the cell phone video to the jury."

To that end, the trial court first found that it should not have allowed the video to be used to impeach Dr. Kadiyala.  The trial court reasoned that the video was unauthenticated and it did not meet the requirements typically imposed on demonstrative aids. The court also found that introduction of the video implicated Rule 403 concerns.

Next, the trial court found that its error in allowing the video to be used prejudiced Ewing. When the video played for the jury, the trial court explained, there was a "critical factual dispute about how the bunk bed fell"—"the cell phone video was highly prejudicial and no adequate 'correcting instructions' were given," and "Carnival's counsel intentionally elicited the evidence and relied upon it in closing argument."  Noting that the jury was not required to believe Carnival's explanation that screws in the bunk assembly must have come loose, and underscoring that Carnival neither "present[ed] . . . a viable theory about why the *other* upper bed in Ewing's cabin was also unlocked" nor "provide[d] documentary evidence to corroborate [the cabin steward's] testimony that he actually locked the bed and used the pull-down measure," the trial court concluded that "there was considerable conflicting evidence and the jury had a wide range of possible verdicts[.]"  And while Carnival had "indicated before trial that it would factually challenge [Ewing's] version of how the incident occurred," that was "a far cry from suggesting that [Ewing] himself vandalized a tamper-resistant lock by jimmying it open with a knife or other similar device."  "This specific theory was never mentioned before trial, and Mr. Ewing did not have the

23-10883                Opinion of the Court                    9

opportunity to prepare for it." Thus, the trial court concluded, there was evident and substantial prejudice from the use of the video.[2]

Finally, the trial court concluded that its curative instruction was "too little, too late." "Given that the instruction did not instruct the jury to disregard the evidence and instead expressly advised it that it could consider the cell phone video, it is debatable whether the instruction [could] fairly be classified as a *curative* instruction." (emphasis in original). Even if so, "the instruction was ineffective and inadequate." "By instructing the jury that it could (or could not) consider the video," the trial court concluded, the "directive cured nothing. To the contrary, it reminded the jury about the cell phone video six days after it was shown." "This delay in providing the instruction aggravated the substantive inadequacy of the instruction."

In sum, the trial court explained, it had erred by "(1) incorrectly allowing Carnival to show the jury an unauthenticated, unduly prejudicial cell phone video which Carnival created for trial purposes; (2) allowing Carnival's counsel to cross-examine Dr. Kadiyala about it; and (3) failing to provide a timely and adequate curative question." The trial court therefore "[could] not say with fair assurance that the verdict was not substantially swayed by these

---

[2] The trial court also noted that Carnival plainly elicited the evidence, since "[i]t arranged to create the video and to confront Dr. Kadiyala about it."

errors" nor "that Mr. Ewing's substantial rights were not affected." Thus, the court granted the motion for a new trial.

The case was retried (with Carnival precluded from using the videotape) and the second jury returned a verdict for Ewing.[3] Carnival appealed.

## II.　Standard of Review

We review a district court's grant of a motion for a new trial "under the abuse of discretion standard." *Ard v. Sw. Forest Indus.,* 849 F.2d 517, 520 (11th Cir. 1988). "A district court abuses its discretion if it applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings of fact that are clearly erroneous." *Klay v. United Healthgroup, Inc.,* 376 F.3d 1092, 1096 (11th Cir. 2004) (quotation omitted). "[I]f the trial court *granted* the motion for a new trial, review by the appellate court is [generally] more stringent." *Williams v. City of Valdosta,* 689 F.2d 964, 974 (11th Cir. 1982) (emphasis added).

Even so, because the trial court here granted a new trial to correct its *own* evidentiary error, rather than because the jury's verdict was against the great weight of the evidence, we afford "wide discretion" to its decision to order a new trial. *Williams,* 689 F.2d at 974 & n.8. "Because the trial judge is actually present at

---

[3] Carnival's corrected brief makes passing reference to errors in the second trial but Carnival advances no argument with citations to authority, and so any arguments about the second trial are abandoned. *See Sapuppo v. Allstate Floridian Ins. Co.,* 739 F.3d 678, 682 (11th Cir. 2014).

trial, and best able to determine whether the proceeding has been 'contaminated' by events outside the jury's control, his decision to grant a new trial because of a legal error . . . is less likely to constitute an abuse of discretion." *Williams*, 689 F.2d at 975 n.8. We are, therefore, usually "more hesitant in overturning the grant of a new trial based on such grounds." *Id.*

Finally, we may also "affirm on any ground supported by the record, regardless of whether that ground was relied upon or even considered below." *PDVSA US Litig. Trust v. LukOil Pan Americas LLC*, 65 F.4th 556, 562 (11th Cir. 2023) (quotation omitted).

### III.    Discussion

Carnival argues that the trial court abused its discretion in granting a new trial. In the main, Carnival contends that the trial court "conflat[ed] impeachment evidence with substantive evidence" and therefore incorrectly analyzed the video under standards required to admit substantive evidence, relying on cases addressing the admissibility of substantive evidence. The trial court's reliance on standards typically applied to substantive evidence was error, Carnival insists, because the video "was played and used in cross-examination for the sole purpose of . . . impeaching [ ] Kadiyala's contentions." Carnival also argues that "no undue prejudice resulted from the . . . video" because it never argued that Ewing himself vandalized the bunk assembly. And finally, Carnival submits that any prejudice was alleviated by the trial court's curative instruction. We disagree, concluding (albeit

for slightly different reasons than the trial court gave) that the court did not abuse its discretion in granting a new trial.[4]

"[G]ranting motions for new trial touches on the trial court's traditional equity power to prevent injustice and the trial judge's duty to guard the integrity and fairness of the proceedings before him[.]" *Christopher v. Florida*, 449 F.3d 1360, 1366 n.4 (11th Cir. 2006). Thus, Federal Rule of Civil Procedure 59 authorizes a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" Fed. R. Civ. P. 59(a)(1)(A). As relevant here, an evidentiary error is not a basis to set aside a verdict if it "do[es] not affect any party's substantial rights." Fed. R. Civ. P. 61. "If one cannot say, with fair assurance,

---

[4] As a preliminary matter, we reject Carnival's suggestion that we must review the trial court's grant of a new trial with special skepticism because, in its view, the court effectively concluded the jury's verdict was against the great weight of the evidence. *See Williams*, 689 F.2d at 974 (11th Cir. 1982) ("[A]lthough the abuse of discretion standard governs regardless of the grounds for which the new trial was requested, review by the appellate court will be more rigorous when the basis for the motion was the weight of the evidence[.]"). To be sure, the trial court referenced the strength of the evidence (which necessarily includes its own judgments about the strength of that evidence), but it did so to explain that the contested factual issues were close. The recognition that the issues were close, in turn, informed the trial court's finding that implicitly accusing Ewing of tampering with the bunk was harmful. *See Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.*, 37 F.3d 1460, 1465 (11th Cir. 1994) (two of the factors in deciding whether to grant a new trial are "the closeness of the factual disputes" and "the prejudicial effect of the evidence"). This recognition did not transform the court's analysis from an examination of its own legal rulings into a conclusion that the jury's verdict was against the weight of the evidence.

that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." *Ad-Vantage*, 37 F.3d at 1465 (11th Cir. 1994) (quotation omitted) (alterations accepted).  We have said that "the factors to consider in determining whether . . . substantial rights were affected [include] the number of errors, the closeness of the factual disputes, the prejudicial effect of the evidence, the instructions given, and whether counsel intentionally elicited the evidence and focused on it during the trial."  *Id.*

To begin, we are not persuaded that the trial court abused its discretion in granting a new trial simply because it found fault in the video primarily because of evidentiary rules typically applied to substantive evidence.  While Ewing is correct that the court leaned heavily on the fact that the video had not been authenticated or shown to conform with the standards for demonstrative exhibits—even though the video was specifically offered and allowed as impeachment evidence—that reliance does not necessarily mean that the trial court committed an error of law in granting the motion for a new trial.  To the contrary, the trial court's concerns and decision are well supported under a traditional Rule 403 analysis.

Federal Rule of Evidence 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

Courts regularly weigh the probative value of impeachment evidence against its potential for unfair prejudice. *See, e.g.*, *United States v. Abel,* 469 U.S. 45, 54–55 (1984) (examining evidence intended to impeach a witness for bias under Rule 403); *United States v. Henderson,* 409 F.3d 1293, 1298 (11th Cir. 2005) (same); *United States v. Hands*, 184 F.3d 1322, 1328 (11th Cir. 1999) (holding that impeachment evidence of violent spousal abuse was excludable under Rule 403 because it was "particularly likely to incite a jury to an irrational decision" (quotation omitted)).

Here, there was obvious potential for significant prejudice and confusion. In attempting to impeach Dr. Kadiyala, Carnival introduced a video that could easily be misused by the jury as not only *substantive* evidence, but *key* substantive evidence, all without being properly authenticated or validated as demonstrative evidence. As the trial court explained, Ewing's theory of the case was that the bunk beds were not stored or locked properly, as shown by the fact that the other bunk bed across the cabin was unlocked, as well. Carnival, by contrast, had argued that its steward had locked and stowed both beds—positing that two screws were loose and fell out over time, through no fault of Carnival's. Against that backdrop, the trial court reasonably found that the video showing someone jimmying open a similar bunk bed "injected the notion that Mr. Ewing himself [had] caused the bed to fall on his head by using a knife or other object to jimmy open the lock[.]" So the potential for prejudice or confusion was very high.

On the other side of the ledger, the probative value of undermining (what Carnival took to be) Kadiyala's point—that the lock was tamper proof—was relatively low, because whether the lock was tamper proof was not particularly important to Carnival's loose-screws defense. At best, the impeachment effort might have suggested that Kadiyala's conclusions were broadly or generally unreliable—which still would not necessarily lend credence to Carnival's own theory of the case. Thus, there was ample reason to conclude the probative value of the video as impeachment evidence was substantially outweighed by the risk of unfair prejudice and confusion. *See Henderson*, 409 F.3d at 1298 (approving the exclusion of evidence that "posed a disproportionate risk of unfairly inflaming the jury's emotions and sidetracking the trial" on "irrelevant question[s]").

Of course, the trial court did not explicitly couch its analysis in Rule 403 terms, but it did invoke Rule 403 in explaining the problems with allowing the video to be used to impeach Dr. Kadiyala. And the court found, presumably for many of the same reasons just discussed, that "[the video's] probative value [was] substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Thus, even accepting Carnival's submission that the video was not subject to the authentication and demonstrative evidence standards required for substantive evidence, we conclude that it is appropriate to affirm the district court's evidentiary concerns on Rule 403 grounds. *PDVSA*, 65 F.4th at 562.

Carnival responds that it "never made" the argument that "the bunk was opened by [Ewing]." "[A]nyone could have opened the bunk with . . . a butter knife," Carnival says. But the district court was not persuaded that the jury would necessarily understand the evidence that way, and neither are we. Again: when the video was played to the jury, there was a "critical factual dispute about how the bunk bed fell," and Carnival was seeking to undermine Ewing's core theory that the steward either did not lock the bunk or properly return it to the stowed position. The video it used to do so depicted a person intentionally prying the bunk open. So whether Carnival meant to do so or not, it was reasonable to conclude that the video unfairly "injected the notion that Mr. Ewing himself [had] caused the bed to fall on his head by using a knife or other object to jimmy open the lock[.]"[5] Under the circumstances, the concern that this inference would prejudice Ewing or confuse the jury was well founded.

Thus, the fact that Carnival introduced the video as impeachment evidence does not mean that the trial court abused its discretion in concluding that it should not have allowed the video to be shown.

---

[5] Carnival resists the conclusion that it injected the fraud issue into the trial, protesting that it was Ewing's counsel who "extensively argued [against] the notion that Mr. Ewing had sought to perpetrate a fraud"—but that just begs the question. If, as the district court correctly found, Carnival had first opened the door to the fraud inference, then Ewing can hardly be blamed for trying to rebut the inference once the door was opened.

We similarly reject Carnival's argument that the curative instruction was enough to prevent or remedy any prejudice. *Ad-Vantage*, 37 F.3d at 1465 (considering "the instructions given" to the jury among other factors to determine whether substantial rights were affected). Carnival points out that we normally presume juries follow instructions, and it emphasizes that the trial court's curative instruction here directed the jury to consider the video "for the limited purposes which Carnival wanted to accomplish with [it], namely[,] trying to impeach Mr. Kadiyala regarding his testimony that the bunk bed lock was tamper proof." (emphasis omitted).

At best, however, Carnival's defense of the curative instruction shows that the trial court *could have* found the instruction sufficient—not that the trial court abused its discretion in finding otherwise. *Doe v. Rollins Coll.*, 77 F.4th 1340, 1347 (11th Cir. 2023) ("The abuse of discretion standard allows for a range of choice, and that means sometimes we will affirm even though we might have decided the matter differently in the first instance.") Here, since the trial court reasonably found that the video had injected the notion of Ewing tampering with the bunk into a hotly contested fact question about how the bunk fell, it follows that the trial court had discretion to find its instruction that "the jury . . . could (or could not) consider the video," insufficient to cure the prejudice caused by introducing the video, especially "six days after [the video] was shown." *See Peat, Inc. v. Vanguard Rsch., Inc.*, 378 F.3d 1154, 1162 (11th Cir. 2004) (considering the closeness of a

disputed factual question in deciding whether a new trial was warranted).

Thus, we conclude that the district court did not abuse its discretion in granting the motion for new trial. Accordingly, we affirm.

**AFFIRMED.**